**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| AMANATULLAH, *et al.*, | ) | |
| | ) | |
| Petitioners, | ) | |
| v. | ) | Civil Action No. 10-CV-536 (HHK) |
| | ) | |
| BARACK OBAMA, *et al.*, | ) | |
| | ) | |
| Respondents. | ) | |

**MOTION TO DISMISS FIRST AMENDED PETITION**
**FOR WRIT OF HABEAS CORPUS**

Petitioner Amanatullah is a citizen of Pakistan detained by the Department of Defense

("DoD") at Bagram Airfield, a military base in the Parwan Province of the Islamic Republic of

Afghanistan ("Afghanistan").  The amended petition alleges that Amanatullah disappeared in

February 2004 while on a business trip to Iran, was detained by British forces in Iraq, and was

then transferred to U.S. custody at Bagram.  He challenges the lawfulness of his detention, the

conditions of his confinement, the denial of access to the courts and to an independent, impartial

administrative tribunal, and the denial of assistance of counsel under the Constitution and the

laws and treaties of the United States.

As discussed below, under binding circuit precedent, this Court has no subject matter

jurisdiction over the instant habeas petition.  In *Maqaleh v. Gates*, 605 F.3d 84 (D.C. Cir. 2010),

which involved three alien detainees at Bagram who similarly alleged that they were captured

outside Afghanistan, the Court of Appeals held that there was no federal court jurisdiction to hear

those alien detainees' petitions because "the Suspension Clause does not extend to aliens held in

Executive detention in the Bagram detention facility in the Afghan theater of war."  *Id.* at 99.  In

reaching this conclusion, the Court of Appeals applied the factors articulated in *Boumediene v.*

*Bush*, 553 U.S. 723 (2008), for determining the extraterritorial application of the Suspension Clause of the Constitution, Art. I. § 9 cl. 2, which included, for example, the practical obstacles for extending the writ, the nature and the site of the detention, and the process for determining a detainee's status.

Since the Court of Appeals' decision in May 2010, the factual predicates underlying the Court's analysis of the *Boumediene* factors have not materially changed in a way that would affect the jurisdictional determination.  The practical obstacles of extending the writ there remain unchanged because just as when *Maqaleh* was decided, Bagram remains an active war zone today and continues to be within the sovereign territory of another nation.  Thus, Moreover, consistent with the Court of Appeals' findings that the United States has no intent "to occupy the [Bagram] base with permanence, nor is there hostility on the part of the 'host' country," *Maqaleh*, 605 F.3d at 97, the attached declaration of the Deputy Assistant Secretary of Defense for Detainee Policy, William K. Lietzau, explains that DoD is working collaboratively with the host government to facilitate the eventual transfer of detention operations at Bagram to the host government.  In fact, the transition has already begun.  This ongoing collaborative process confirms that the United States has no *de facto* sovereignty over Bagram Airfield.

Indeed, the only significant change in the factual predicates of *Maqaleh* is DoD's implementation of more robust administrative procedures for reviewing a detainee's status.  The new procedures not only enhance a detainee's ability to challenge his detention, but also significantly improve DoD's ability to assess whether the facts support the detention of each detainee, the level of threat the detainee represents, and the detainee's potential for rehabilitation and reconciliation.  Since the implementation of these new procedures, hundreds of detainees have been released from Bagram or transferred to the Afghan or other governments for

prosecution, reconciliation, or release.  Although the amended petition alleges that the new

procedures continue to be inadequate, the argument in no way undercuts the Court of Appeals'

ultimate conclusion in *Maqaleh* that habeas does not extend to Bagram.  Whatever weight the

Court of Appeals had placed on the procedures then available for determining the *Maqaleh*

petitioners' status, the Court found that the factor did not suffice to extend the Suspension Clause

to Bagram.  Accordingly, the improvement of those procedures cannot compel a different

conclusion.  In sum, this Court has no jurisdiction to review the instant petition.

## BACKGROUND

### I.     THE PETITIONER

Petitioner Amanatullah is a Pakistani citizen detained at the Detention Facility in Parwan

("DFIP"), a newly constructed detention facility located on the outer perimeter of Bagram

Airfield.[1]  Declaration of William K. Lietzau (dated May 9, 2011) (attached as Exhibit 1), ¶ 2;

Declaration of Vice Admiral Robert S. Harward (dated May 28, 2011) (attached as Exhibit 2),

¶ 15.  Background information concerning Bagram Airfield, the nature of United States' and

coalition forces' presence there, and the lease agreement between the United States and

Afghanistan is described in the Court of Appeals' decision in *Maqaleh*, and remains accurate

today.  *See Maqaleh*, 605 F.3d 87-88; *see also* Harward Decl. ¶¶ 2-8.  The amended petition

alleges that Amanatullah disappeared while on a business trip to Iran in February 2004.  Am. Pet.

¶ 14.  He was allegedly detained by British Armed Forces in Iraq and transferred to U.S. custody

at Bagram in 2005.  *Id.* ¶ 21.

---

[1]  Petitioner was previously held at the Bagram Theater Internment Facility ("BTIF"), also
at Bagram Airfield.  In 2009, all detainees housed at the BTIF, including Petitioner, were
transferred to the DFIP.  Lietzau Decl., ¶ 2.

## II.     DETERMINATION OF PETITIONER'S STATUS

All detainees at the DFIP, including Petitioner, receive periodic administrative reviews of their status, threat, and potential for rehabilitation and reintegration.  *See* Lietzau Decl. ¶ 8.  The review is based on policy guidance adopted by the Deputy Secretary of Defense on July 2, 2009 ("July 2, 2009 Policy") that sets forth enhanced detainee review procedures for assessing whether the facts support the detention of each detainee under the Authorization for Use of Military Force ("AUMF"), Pub. L. 107-40, 115 Stat. 224 (2001), as informed by the laws of war; the level of threat the detainee represents; and the detainee's potential for rehabilitation and reconciliation. *See* Ex. B to Harward Decl. at 1-2.  Although the government had informed the Court of Appeals in *Maqaleh* of the July 2, 2009 Policy, which was then not yet fully implemented, the Court of Appeals "decide[d] the case based on the procedures that had been in place" when the District Court decided the jurisdictional question in April 2009.  *Maqaleh*, 605 F.3d at 96 n. 4.  On July 11, 2010, the Combined Joint Interagency Task Force 435 ("CJIATF-435"), which is responsible for operating the DFIP, also issued further guidance regarding the new procedures.  Harward Decl. ¶¶ 1, 9; Ex. C.

Pursuant to the July 2, 2009 Policy and the additional guidance issued by CJIATF-435, a Detainee Review Board ("DRB") mostly recently reviewed Petitioner's detention on December 4, 2010.  Prior to that time, Petitioner had DRB reviews on June 5, 2010 and December 2, 2009. In each of Petitioner's DRB reviews, U.S. forces determined that Petitioner met the criteria for internment and that he was lawfully detained pursuant to the AUMF, as informed by the law of war.  Harward Decl., ¶ 15.

### III.   THE D.C. CIRCUIT'S DECISION IN *MAQALEH V. GATES*

On April 2, 2009, following the consolidation for jurisdictional purposes of four Bagram habeas petitions then pending before different judges of this Court, Judge John D. Bates held that three of those four petitioners—all of whom alleged that they were non-Afghans captured outside Afghanistan—were entitled to seek the protection of the writ of the habeas corpus.[2] *Maqaleh v. Gates*, 604 F. Supp. 2d  205 (D.D.C. 2006).  Applying the *Boumediene* factors, Judge Bates held that "[a]side from where they are held, [those three] Bagram detainees are no different than Guantanamo detainees." *Id.* at 216.  Judge Bates thus invalidated, as applied to those three petitioners, Section 7(a) of the Military Commissions Act of 2006 ("MCA"), Pub. L. No. 109-366, which divests this Court of jurisdiction to review habeas petitions filed by or on behalf of aliens held by the United States as "enemy combatants." 28 U.S.C. § 2241(e)(1).  Thereafter, upon the Government's motion, Judge Bates certified his decision for interlocutory appeal under 28 U.S.C. § 1292(b).  *Maqaleh*, 620 F. Supp. 2d 51.

On May 21, 2010, the Court of Appeals reversed Judge Bates' decision extending the protection of the writ of habeas corpus to the three *Maqaleh* petitioners.  *Maqaleh v. Gates*, 605 F.3d 84 (D.C. Cir. 2010).  The Court of Appeals first agreed with Judge Bates that Section 7(a) of the MCA explicitly barred review of any statutory habeas claims by the *Maqaleh* petitioners.

---

[2] In the same opinion, Judge Bates deferred his final ruling with regard to the fourth petitioner, who, unlike the other three petitioners, was a citizen of Afghanistan, and thus, in Judge Bates' view, implicated different considerations under *Boumediene*.  After ordering further briefing in that case, Judge Bates granted the Government's motion to dismiss on June 29, 2009. *Wazir v. Gates*, 629 F. Supp. 2d 63 (D.D.C. 2009).  The petitioner appealed, but the appeal was subsequently mooted by his release from U.S. custody, which also resulted in the vacatur of Judge Bates' June 2009 decision.  *See Wazir*, 06-cv-1697 (ECF No. 94) (Court of Appeals Order dated May 17, 2010).

*Id.* at 92, 94. It reached a different conclusion as to the reach of the Suspension Clause when analyzing the *Boumediene* factors, which are:  (1) the citizenship and status of the detainees and the process for determining their status; (2) the nature of the sites of apprehension and detention; and (3) the practical obstacles to extraterritorial application of the Suspension Clause.  *See Boumediene*, 553 U.S. at 766.

With respect to the first prong, the Court of Appeals found that adequacy of process considerations more strongly favored the *Maqaleh* petitioners than the *Boumediene* petitioners. *Maqaleh*, 605 F.3d at 96.  This was so because the procedures then available to determine the *Maqaleh* petitioners' status afforded them less protection than had been afforded to the petitioners at Guantanamo in *Boumediene*, or to those in *Johnson v. Eisentrager*, 339 U.S. 763 (1950), who were held in the Landsberg prison in post WWII Germany and had been tried by military commission.  *Maqaleh*, 605 F.3d at 96.

As for the site of apprehension prong of the second factor, however, the Court of Appeals rejected the *Maqaleh* petitioners' claim that their capture outside Afghanistan weighed in favor of extending the writ to them at Bagram.  Instead, the Court focused on the fact that these petitioners, like the *Boumediene* and *Eisentrager* petitioners, were captured outside the United States, and thus, that their apprehension abroad "would appear to weigh *against* the extension of the writ."  *Id.* at 97-98 (emphasis added).  Further, the Court found that the site of detention prong of the second factor "weighs heavily in favor of the United States," *id.* at 96 because "whereas the United States has maintained total control of Guantanamo Bay for over a century, even in the face of a hostile government . . . there is no indication of any intent to occupy the [Bagram] base with permanence, nor is there hostility on the part of the 'host' country."  *Id.* at

97. Thus, the Court determined that, "while it is certainly realistic to assert that the United States has *de facto* sovereignty over Guantanamo, the same simply is not true with respect to Bagram." *Id.*

Finally, the Court found that the third, practical obstacles factor "weighs overwhelmingly in favor of the position of the United States" because "[i]t is undisputed that Bagram, indeed the entire nation of Afghanistan, remains a theater of war." *Id.* The Court found that the position of the United States is even stronger in *Maqaleh* than it was in *Eisentrager*, which found no federal court jurisdiction to hear the claims of petitioners held at the Landsberg prison in post WWII Germany, because in *Eisentrager* active hostilities in the European theater had already come to an end. The Court noted the fact that Bagram "has been subject to repeated attacks from the Taliban and al Qaeda, including a March 2009 suicide bombing striking the gates of the facility, and Taliban rocket attacks in June of 2009 resulting in death and injury of United States service members and other personnel." *Id.* at 88. Indeed, although not in the record before the Court of Appeals, around the time of the *Maqaleh* decision, Taliban insurgents attacked Bagram Airfield before dawn, firing their weapons over American defenses into the base. In the eight-hour firefight, an American contractor and at least ten attackers were killed, and nine U.S. service members were wounded. *See* Robert H. Reid, Associated Press, *Taliban Attack Key US Base in Afghanistan* (May 19, 2010).[3]

Moreover, the Court found that the fact that detention at Bagram is within the sovereign territory of another nation (where the United States does not enjoy *de facto* sovereignty) by itself creates practical difficulties. *Maqaleh*, 605 F.3d at 99. The Court thus concluded that "under

---

[3] *Available at* http://abcnews.go.com/International/wireStory?id=10685064.

both *Eisentrager* and *Boumediene*, the writ does not extend to the Bagram confinement in an active theater of war in a territory under neither the *de facto* nor *de jure* sovereignty of the United States and within the territory of another *de jure* sovereign." *Id.* at 98.

Notably, the Court of Appeals reached this conclusion notwithstanding the *Maqaleh* petitioners' claim that the United States transferred them into an active conflict zone from outside Afghanistan for purposes of evading judicial review. The Court expressed doubt that the claim "goes to either the second or third of the Supreme Court's enumerated factors" but held that it need not decide "whether such manipulation by the Executive might constitute an additional factor" because "the notion that the United States deliberately confined the detainees in the theater of war rather than at, for example, Guantanamo, is not only unsupported by the evidence, it is not supported by reason." *Id.* at 99.

On July 23, 2010, the Court of Appeals denied the *Maqaleh* petitioners' petition for panel rehearing, noting, however, that those petitioners had cited evidence not in the record, and thus, that the denial "[was] without prejudice to their ability to present this evidence to the district court in the first instance." *Maqaleh v. Gates*, No. 09-5265 (D.C. Cir. July 23, 2010). By leave of Judge Bates, the *Maqaleh* petitioners have moved to amend their habeas petitions based on, among other things, allegedly newly discovered evidence of manipulation as to the place of their detention. They also cited—albeit incorrectly—recent developments at Bagram Airfield, which are similarly alleged in the amended petition in this case and are addressed below. Respondents have moved to dismiss those amended petitions.

**ARGUMENT**

**THIS COURT SHOULD DISMISS THE AMENDED HABEAS PETITION
FOR LACK OF SUBJECT MATTER JURISDICTION**

Under *Maqaleh v. Gates*, this Court has no subject matter jurisdiction over this habeas

petition.  Section 7(a) of the MCA explicitly bars this Court's review of Petitioner's statutory

habeas claim.  That provision is constitutional, as the Court of Appeals held in *Maqaleh*, because

the Suspension Clause does not extend to alien detainees, such as Petitioner, who have been

determined by the United States to be properly detained as "enemy combatants" at Bagram.  28

U.S.C. § 2241(e)(1).  To be sure, the Court of Appeals' analysis of the *Boumediene* factors—and

its ultimate conclusion—are based on certain factual predicates.  But, as discussed below, the

amended habeas petition has pointed to no material difference in the factual predicates of

*Maqaleh* and this case that would compel a different conclusion here.

**I.      The Site of Detention Factor Continues to Weigh Strongly In Favor of the United
        States.**

**A.      The United States Has No Intention to Remain at Bagram Permanently.**

As noted above, the Court of Appeals found that the United States has no *de facto*

sovereignty over Bagram in part because, in contrast to the century-long occupation of

Guantanamo by the United States, "there is no indication of any intent to occupy the [Bagram]

base with permanence, nor is there hostility on the part of the 'host' country."  *Maqaleh*, 605

F.3d at 97.  The D.C. Circuit's finding was based on the government's representation that, "[i]n

contrast to Guantanamo, the United States does not have any plans, or even a desire, to establish

a permanent military base at Bagram."  U.S. Opening Br., Nos. 09-5265, 09-5266, 09-5267, filed

Sept. 14, 2009, at 44.  The government had also indicated that Bagram "is not intended to serve

as a permanent facility to advance independent U.S. interests." U.S. Reply Br., filed Nov. 16,

2009, at 4. With respect to its detention operations at Bagram, the government had further

informed the Court of Appeals that "the United States has no interest in holding detainees longer

than necessary," U.S. Opening Br. at 57, and "the goal of the United States is to transfer 'all

detention operations in Afghanistan, to include [the detention facility at Bagram], to the Afghan

government.'" U.S. Reply Br. at 10 (quoting Gen. Stanley A. McChrystal, NATO International

Security Assistance Force, Afghanistan, *Commander's Initial Assessment* (Aug. 30, 2009), at F-

4).[4]

      Presumably attempting to undercut the above representations by the government,

Petitioner alleges that the Executive has purportedly announced a plan to retain control of a

section of the detention facility at Bagram to hold and interrogate people seized outside

Afghanistan potentially indefinitely and without charge.[5] Am. Pet. ¶¶ 102-03. In addition to

highlighting the expanding detention capacity at Bagram, the increasing number of detainees

there, and the large number of U.S. troops in Afghanistan facing active hostilities, Petitioner also

criticizes the lack of a specified time line, the conditional nature of the transfer of detention

---

    [4] Indeed, when the government notified several judges of this Court of its intent to demolish the old detention facility known as the Bagram Theater Internment Facility ("BTIF"), it also explained that the new detention facility, the DFIP, "is on a corner of Bagram Airfield, which is expected to facilitate its transfer to Afghan government control as soon as reasonably practicable." *See, e.g.*, Notice to the Court, 06cv1669, Dec. 30, 2009, ECF No. 47.

    [5] The claim, however, has no factual basis and is not even supported by the *Los Angeles Times* articles cited by Petitioners. Am. Pet. ¶¶ 102-03 (citing Julian Barnes, *U.S. May Seek Use of Afghan Prison*, L.A. Times, June 8, 2010, and *U.S. Hopes to Share Prison with Afghanistan*, L.A. Times, June 9, 2010).

operations to the Afghan government, and the perceived indefinite nature of the detention of non-Afghan detainees at Bagram.[6]  Am. Pet. ¶¶ 109-118.

None of these allegations, however, changes the Court of Appeals' prior finding that the site of detention factor weighed heavily against extending the writ to Bagram.  The United States continues to have no "intent to occupy the base with permanence," *Maqaleh*, 605 F.3d at 97; its presence at Bagram is due to the ongoing war, which, in turn, necessitates the detention of individuals captured during the armed conflict.  And it is well-recognized that "the capture and detention of enemy forces is by universal agreement and practice an important incident of war." *Hamdi v. Rumsfeld*, 542 U.S. 507, 518-19 (2004) (plurality opinion); *see also id.* at 521 ("[W]e understand Congress's grant of authority for the use of 'necessary and appropriate force' to include the authority to detain *for the duration of the relevant conflict*, and our understanding is based on longstanding law-of-war principles.") (emphasis added).  Thus, as Deputy Assistant Secretary of Defense Lietzau explains, the United States "may need to maintain some detention capacity in Afghanistan, pursuant to the laws of war, as long as military operations continue." Lietzau Decl., ¶ 10.  Put differently, the United States has no interest in maintaining such

---

[6] Selectively citing a statement in a May 27, 2010 National Security Strategy paper which stated that, "[w]hen we are able," we will "prosecute terrorists in Federal courts or in reformed military commissions that are fair, legitimate, and effective," Petitioner leaped to the conclusion that the Executive is reserving "the option of detaining individuals seized during counterterrorism operations indefinitely and without charge." Am. Pet. ¶ 102.  What Petitioner failed to point out was that the paper goes on to state that "[f]or detainees who cannot be prosecuted—but pose a danger to the American people—we must have clear, defensible, and lawful standards.  We must have fair procedures and a thorough process of periodic review, so that any prolonged detention is carefully evaluated and justified.  And keeping with our detainee Constitutional system, it will be subject to checks and balances ." This describes the enhanced review process detainees, including Petitioner, now receives at Bagram, known as the Detainee Review Board ("DRB") procedures.  And in conformity with § 1405(c) of the Detainee Treatment Act of 2005, Pub. L. No. 109-163, Tit. XIV, DoD duly provided Congress a 60-day notice of the new procedures prior to their implementation.  *See* Harward Decl., Ex. B at 1-2.

detention capacity "beyond the cessation of hostilities with the Taliban, al-Qaeda and associated forces." *Id.* ¶ 9.  In sum, Bagram exists only to support the current war.

Nor has the nature of the U.S.-Afghan relationship changed, *cf. Maqaleh*, 605 F. 3d at 97 (observing that there was no "hostility on the part of the 'host' government").  Afghanistan, on whose sovereign territory Bagram Airfield is located, remains an ally.  Afghan forces are conducting military operations in concert with U.S. and coalition forces to defeat the Taliban, al Qaeda and associated forces.  Far from having any *de facto* sovereignty, the United States fully respects Afghan sovereignty and remains committed to transition detention operations to Afghanistan.  In May 2010, the President specifically "reaffirmed [the United States'] commitment to transitioning responsibility for detention facilities to the Afghan Government." *Joint Statement from the President and President Karzai of Afghanistan* (dated May 12, 2010).[7] The President agreed with President Karzai of Afghanistan that "[t]his process [would] begin at the Parwan detention facility in January 2011." *Id.*  Moreover, in their joint statement, "[b]oth Presidents recognized that a successful transition will be an important milestone toward achieving President Karzai's inaugural pledge of having the Afghan Government assume full responsibility over detention operations." *Id.*  The joint statement further provided:

> As part of this transition process, President Karzai welcomed continued U.S. assistance to build a safe, secure, and humane corrections system.  Underscoring the United States' respect for Afghanistan's sovereignty, President Obama also emphasized his strong desire to see all search, arrest, and detention operations be carried out by the Afghan National Security Forces.  He and President Karzai directed their senior defense advisors to accelerate and further clarify the timeline for the transition process, and also to consider additional steps to address this Afghan Government priority.

---

[7] *Available at* http://www.whitehouse.gov/the-press-office/joint-statement-president-and-president-karzai-afghanistan.

*Id.*

Consistent with the President's commitment, U.S. forces began the transition process in January this year when it turned over a detainee housing unit to the Afghan Ministry of Defense. Lietzau Decl., ¶ 3; Harward Decl., ¶ 6. The continued pace of transition will necessarily depend on, among other things, the Afghan capacity and capability to detain insurgents securely and whether the Afghan government is fully equipped and able to perform its detention, prosecution, judicial and incarceration responsibilities in accordance with its international obligations and Afghan law. *See* Lietzau Decl., ¶ 3.

Moreover, in order to expedite transition of the DFIP to the Afghan government, U.S. forces are planning for new construction to provide additional housing capacity adjacent to the DFIP. This additional detention capacity will enable U.S. forces to continue to conduct detention operations on a limited basis during the ongoing surge in military operations in Afghanistan and pending the transfer of non-Afghan detainees to their home countries or to third countries. *Id.* ¶ 5. U.S. forces will eventually transition this additional housing capacity to the Afghan government with the condition-based approach discussed above. *Id.* Although it is currently unknown when the full transition will occur, these fluid operational demands of war in no way call into question the United States' commitment to support Afghan sovereignty or to transition responsibility for detention operations to the Afghan government. In sum, the Court of Appeals' determination that the United States has no *de facto* sovereignty over Bagram remains true today.

**B.    There Is No Evidence That The Executive Manipulated Petitioner's Place of Detention to Evade Judicial Review.**

A central focus of the amended petition is the Executive's alleged intent to evade judicial review and purported plan to "hold and interrogate people seized from countries outside

Afghanistan" at Bagram.  Am. Pet. ¶ 104; *id.* ¶¶ 50-64.  The *New York Times* article cited by Petitioner, however, does not support the existence of such a plan.  *See id.*  The article merely suggests that the government *could* use Bagram to hold and interrogate terrorism suspects captured elsewhere in the world and possibly to house detainees currently held at Guantanamo Bay.  *See* Julian Barnes, *U.S. Hopes to Share Prison with Afghanistan*, L.A. Times, June 9, 2010.[8]

More importantly, whether the United States could bring hypothetical future detainees from outside Afghanistan to Bagram has no relevance to Petitioner's claim of habeas jurisdiction.  In finding that habeas does not extend to the *Maqaleh* petitioners at Bagram, the Court of Appeals focused on the fact that those petitioners were captured outside the United States, not that they were allegedly captured outside Afghanistan.  The Court noted the fact that the *Maqaleh* petitioners, like the petitioners in *Boumediene* and *Eisentrager*, were apprehended abroad "would appear to weigh against the extension of the writ."  *See Maqaleh*, 605 F.3d at 97-98.  While the Court also noted the *Maqaleh* petitioners' allegation that the United States had chosen to detain them at Bagram in order to evade judicial review, the Court found that "that is not what happened here."  *Id.* at 98.  As the Court reasoned,

> [T]he notion that the United States deliberately confined the detainees in the theater of war rather than at, for example, Guantanamo, is not only unsupported by the evidence, it is not supported by reason.  To have made such a deliberate decision to "turn off the Constitution" would have required the military commanders or other Executive officials making the situs determination to anticipate the complex litigation history [regarding Guantanamo habeas litigation] set forth above and predict the *Boumediene* decision long before it came down.

---

[8]  *Available at* http://articles.latimes.com/2010/jun/09/world/la-fg-bagram-20100609.

*Id.* Similarly here, it is unreasonable to assume that the military deliberatively detained Petitioner in Afghanistan (as opposed to transferring him to Guantanamo) for purposes of evading judicial review.

Petitioner alleges that between 2001 and 2004, there were some 45 communications involving the Office of Legal Counsel pertaining to the transfer of detainees and habeas jurisdiction and/or litigation.  Am. Pet. ¶¶ 58-59.  This hardly constitutes evidence of manipulation.  Since the military campaign against the Taliban, al Qaeda, and associated forces began in late 2001, the government legitimately has had to consider the issue of detention of individuals captured during the ongoing armed conflict and the detainees' potential right to habeas relief.  Indeed, Guantanamo habeas litigation began as early as 2002, which necessarily generated considerable government deliberation in every stage of the complex litigation history leading up to the Supreme Court's decision in *Boumediene*.  Such deliberation cannot support the proposition that habeas should apply to Bagram.

Petitioner also speculates, based on news articles, that transfers from Bagram to Guantanamo dropped significantly in 2004 in light of the Supreme Court's decision in *Rasul v. Bush*, 542 U.S. 466 (2004), which held that Guantanamo detainees had statutory habeas rights. *See* Am. Pet. ¶ 56.  Petitioner asserts that this decline is due to an intent to evade judicial review. *Id.* ¶ 57.  If such allegations are sufficient to confer jurisdiction, then federal courts would have world-wide habeas jurisdiction because in any war, the United States always has the option of bringing individuals captured during the armed conflict to the United States but may decide not to do so.  And yet any such decision may be based on considerations that have nothing to do with any intent to avoid judicial review.  Moreover, Petitioner's speculation again ignores the complex

legislative and litigation history leading up to the Supreme Court's decision in *Boumediene* in 2008 – history the Court of Appeals found negated any suggestion that Respondents made a deliberate decision to "turn off the Constitution" with respect to the *Maqaleh* petitioners. Finally, even assuming that there was a decrease in the number of transfers to Guantanamo since *Rasul*, many factors could have been at play, including for example that by May 2006, the government had already expressed its wish to close the detention facility at Guantanamo.[9]

Petitioner further alleges that the government had purposely instituted a "reverse flow from Guantanamo, moving [detainees] to other detention cites specifically to avoid habeas jurisdiction." Am. Pet. ¶ 63. In support of this claim, Petitioner cites media speculation that four high-value detainees were previously at an alleged CIA facility at Guantanamo in late 2003 but were transferred a few months later. *See id.* According to Petitioner, the government transferred these detainees out of Guantanamo because it had predicted the Supreme Court's then pending (but not yet argued) decision in *Rasul*, which was handed down on June 28, 2004. Petitioner further alleges that between 2007 and 2009, at least thirty-six detainees were moved from Guantanamo to Afghanistan, either to the detention facility at Bagram or to the Afghan National Detention Facility ("ANDF"). Am. Pet. ¶¶ 61-62.

Again, such speculation cannot support the proposition that the government had manipulated Petitioner's place of detention to evade judicial review. Petitioner does not allege that he was captured or ever detained at a location where the Suspension Clause applied. As Respondents previously informed Judge Bates in *Maqaleh*, none of the detainees at Bagram, who

---

[9] *See Bush Speaks of Closing Guantanamo Prison*, New York Times (May 8, 2006) (*available at* http://www.nytimes.com/2006/05/08/washington/08bush.html?fta=y).

were determined by the United States to be properly held, were transferred from Guantanamo. *See Maqaleh v. Gates*, 06cv1669, Motion to Dismiss Oral Argument Tr. at 61 (Jan. 7, 2010). Petitioner's insinuation to the contrary is simply wrong.

As for the allegation that some thirty-six Afghan detainees were transferred from Guantanamo to Afghanistan between 2007 and 2009, Petitioner is wrong that some of them were moved to Bagram.  Any such transfers were pursuant to a diplomatic arrangement between the United States and Afghanistan reached as early as 2005 to repatriate Afghan nationals to the exclusive custody and control of the Afghan government at the ANDF, a facility operated by the Afghan Ministry of Defense.  *See* Declaration of Lieutenant Colonel David F. Koonce (dated Oct. 31, 2008), *Wahab v. Bush*, 05cv0886, ECF No. 80-1, filed Nov. 7, 2008.  As part of that diplomatic arrangement, the United States had helped renovate the ANDF, the former block IV of the Pol-e-Charki prison located east of Kabul, and provided training, monitoring and other assistance to the Afghan national guard force to ensure that the detention facility practices and procedures were consistent with international standards.  *See id.*  That arrangement was part of a still broader strategic partnership between the two governments designed to enhance Afghanistan's sovereignty, security, and democracy.  *See* Joint Declaration of the United States-Afghanistan Strategic Partnership, *Wahab v. Bush*, 05cv0886, Nov. 7, 2008, ECF No. 80-2; *see also* Press Release, Embassy of the United States, ECF No. 80-3.  In other words, the only "reverse flow" of Afghan detainees from Guantanamo was to transfer them out of U.S. custody.

Further, Petitioner's "reverse flow" claim, even if true, is undermined by the fact that just three months after *Rasul* was decided, the government actually transferred ten detainees from

Afghanistan to Guantanamo, *see* DoD News Release, dated September 22, 2004.[10]  Moreover,

the four high-value detainees, who Petitioner claims were at Guantanamo in 2003, have been in

military custody at Guantanamo since being transferred from CIA detention in 2006, after *Rasul*

was decided.  There is no evidence of manipulation, and no basis to upset the Court of Appeals'

prior conclusion that habeas does not extend to Bagram.

## II.     The Practical Obstacles of Extending the Writ to Bagram Continue to Weigh Overwhelmingly Against the Extension.

The Court of Appeals previously found that the practical obstacles prong of the

*Boumediene* analysis "weighs overwhelmingly in favor of the position of the United States"

because Afghanistan remains a theater of war.  *Maqaleh*, 605 F.3d at 97.  The Court also found

the fact that "the detention at Bagram is within the sovereign territory of another nation (where

the United States does not enjoy *de facto* sovereignty) by itself creates practical difficulties."  *Id.*

at 99.  Presumably attempting to undercut these findings, Petitioner alleges that civilian criminal

trials of Afghan detainees, allegedly "jointly-run" by the United States and Afghanistan, are now

conducted at Bagram Airfield, and that media and monitoring groups have been traveling to

observe these trials without incident.  Am. Pet. ¶¶ 105-107.

This allegation does not undermine the Court of Appeals' prior conclusion that the

practical obstacles of extending the writ to Bagram strongly counsel against the extension.  As

Deputy Assistant Secretary Lietzau explains, an integral part of the United States' effort to

transition detention operations to Afghanistan is to build Afghan legal capacity for prosecuting

national security cases under Afghan law.  *See* Lietzau Decl., ¶ 7.  Indeed, it is expected that once

---

[10] *Available at* http://www.defense.gov/releases/release.aspx?releaseid=7765.

the DFIP is transferred to the Afghan government, it will become part of the larger Afghan

Justice Center in Parwan, which will be used for the pre-trial detention, prosecution, and post-

trial incarceration of individuals who commit crimes against Afghan security.  *Id.* ¶ 6.  Consistent

with these goals, beginning in June 2010, Afghan judges, prosecutors, and defense counsel began

conducting civilian criminal trials of Afghan detainees who were transferred to Afghan custody,

first at the DFIP and now at the not-yet-completed Afghan Justice Center in Parwan, which is

adjacent to the DFIP.  *Id.* ¶ 7; *see also Afghan Court Tries, Convicts Three Men*, U.S. Central

Command, Press Release, August 3, 2010 (discussing the Government of Afghanistan's

investigation and prosecution of the cases under the Afghan Penal Code).[11]  The fact that these

purely Afghan-run trials are now occurring demonstrates that the Afghan government is

conducting quintessentially sovereign acts in Bagram, making it even more apparent why

Bagram is readily distinguishable from Guantanamo, and bolstering the Court of Appeals' prior

conclusion that extending habeas to Bagram could complicate U.S.-Afghan relations.

The practical obstacles associated with conducting habeas litigation in a theater of war by

a U.S. court, on the other hand, remain the same.  As the Court of Appeals previously noted,

"petitioners cannot credibly dispute[] that all of the attributes of a facility exposed to the vagaries

of war are present in Bagram."  *Maqaleh*, 605 F.3d at 97.  That the Afghan government

legitimately must undertake the responsibility of carrying out its own criminal trials under

Afghan law, and has now chosen to do so at Bagram, where the accused are housed, by no means

suggests that the vagaries of war no longer exist.  In 2010, Bagram Airfield was attacked 29

---

[11]  *Available at* http://www.centcom.mil/en/press-releases/afghan-court-tries-convicts-three-men.

times, and this year, there have been 11 attacks so far, even though the fighting season has just

begun.[12]   The vagaries of war in Afghanistan were also seen recently when the Taliban took

responsibility for the escape of more than 400 prisoners, many of whom are insurgent fighters,

from a prison facility in Kandahar, the same facility from which some 1,000 prisoners escaped in

2008.  *See Afghanistan Recaptures 65 Inmates: Hundreds at Large After Escape*, CNN World,

April 26, 2011.[13]   Afghanistan remains an active war zone, a factor that the Court of Appeals

held overwhelmingly weighs in favor of Respondents than the post-war situation in *Eisentrager*.

*See Maqaleh*, 605 F.3d at 97.  The amended petition has offered no basis to alter that conclusion.

## III.   The Adequacy of Process Factor Now Tips Against Extending the Writ to Bagram.

### A.   Petitioner and Other Detainees Under DoD Custody and Control at Bagram Receive More Process Than Previously Considered by the Court of Appeals.

Petitioner also alleges that the procedures at Bagram for determining detainee status are

inadequate.  In point of fact, however, the adequacy of process factor has actually changed to

bolster the Court of Appeals' prior holding that the Suspension Clause does not apply to Bagram.

As noted before, the Court of Appeals previously found this factor more strongly favored the

*Maqaleh* petitioners than the *Boumediene* petitioners because the procedures available at Bagram

at that time, known as the Unlawful Enemy Combatant Review Board ("UECRB"), afforded the

*Maqaleh* petitioners less protection than had been afforded to the *Boumediene* petitioners, or to

---

[12]  *See, e.g., Taliban Fires Rockets Into Main US Base Near Kabul* (*available at* http://www.aaj.tv/2010/12/taliban-fires-rockets-into-main-us-base-near-kabul); *2 Injured When Insurgents Rockets Hit Bagram* (*available at* http://www.militarytimes.com/news/2011/05/ gannett-afghanistan-bagram-rocket-attack-2-injured-050611).

[13]  *Available at* http://www.cnn.com/2011/world/asiapcf/04/26/afghanistan.prison.break/ index/html.

those in *Johnson v. Eisentrager*, 339 U.S. 763 (1950). *See Maqaleh*, 605 F.3d at 96. Despite

that finding, the Court concluded that the adequacy of process factor was insufficient to tip the

constitutional balance to extend the writ to Bagram.

Since the Court of Appeals' decision in May 2010, DoD has fully implemented and

applied more robust procedures to review Petitioner's status, known as DRB procedures. As

DoD previously informed Congress, the new procedures not only improved DoD's ability to

assess the factual basis of each detainee's detention, the detainee's threat level, and his potential

for rehabilitation and reconciliation, but they also enhanced the detainee's ability to challenge his

detention. *See* Harward Decl., Ex. B at 1. And, although the government had informed the Court

of Appeals of the new procedures which was then not yet fully implemented, the Court of

Appeals "decide[d] the case based on the procedures that had been in place" when the District

Court decided the jurisdictional question. *Maqaleh*, 605 F.3d at 96 n. 4.

As Vice Admiral Harward explains, under the DRB procedures, the commander of the

facility is required to ensure that a detainee receives timely notice of the basis for his internment,

including an unclassified summary of the specific facts that support the basis for such internment.

The status of each detainee is reviewed no later than sixty days after the detainee is initially

transferred to the DFIP, and periodically thereafter, by a board of three field-grade officers. The

DRB process contains procedures that enable the detainee to challenge his detention, including a

reasonable investigation into any exculpatory information the detainee offers, notice to the

detainee of the purpose of the hearing, and the opportunity to present information including

reasonably available witnesses and documentary information. Additionally, every detainee is

appointed a "personal representative" who has access to all reasonably available information,

including classified information, relevant to the determination of whether the detainee meets the

criteria for internment and whether the detainee's continued internment is necessary.  The

personal representative is required to "act and advocate in the best interests of the detainee" by

assisting the detainee in "gathering and presenting the information reasonably available in the

light most favorable to the detainee."  Interpreters are provided to the detainee, if needed.

Subject to certain exceptions, the unclassified session of the board proceedings is open; and

detainees are entitled to attend all open sessions, testify (but may not be compelled to do so), call

witnesses, question the government's witnesses, and present documentary information.  Finally,

the board makes its determination using the preponderance of the evidence standard and based on

the same criteria for who may be lawfully detained that the government has applied in the context

of habeas review of detentions at Guantanamo Bay.  *See* Harward Decl., ¶¶ 10-11.

The DRB procedures provide greater procedural safeguards than the prior UECRB

procedures available at Bagram, or even the Combatant Status Review Tribunal ("CSRT")

previously afforded to detainees at Guantanamo Bay.  *Compare* U.S. Mot. to Dismiss, *Maqaleh*,

06cv1669, ECF No. 18, at 8-9 (discussing UECRB procedures).  To begin with, in contrast with

the UECRB procedures, the DRB procedures readily provide detainees with an opportunity to

call reasonably available witnesses and to present documentary evidence to an impartial board of

commissioned officers.  Indeed, between March 6, 2010 and May 6, 2011, one thousand seven

hundred and ninety-two (1,792) witnesses were called to testify in-person at DRBs, and an

additional four hundred and twenty-five (425) witnesses testified telephonically.  *See* Harward

Decl., ¶ 11.  Unlike in the CSRT process, the government's evidence presented at the DRB proceedings does not benefit from a presumption of validity.[14]  *See id.* ¶ 10.

The provision of a personal representative, which was not provided under the UECRBs, also significantly improves the review process.  Whereas the CSRT personal representative had no confidential relationship[15] with the detainee and there was no requirement that he act and advocate for the detainee, the DRB personal representative is bound by a non-disclosure policy, which prohibits him from disclosing information "detrimental to the detainee's case that was obtained through communications with the detainee" as well as "adverse information discovered by the personal representative's independent investigatory efforts."[16]  Harward Decl., Ex. C at 5. As noted above, the DRB personal representative is also required to "act and advocate in the best interests of the detainee" by assisting the detainee in "gathering and presenting the information reasonably available in the light most favorable to the detainee."  *Id.* ¶ 9(e)(2); *see also* Harward Decl., Ex. B at 6.  Whereas the CSRT personal representative's role was primarily to assist the

---

[14]  *See* Section G(11) of the CSRT procedures ("Burden of Proof. * * * There is a rebuttable presumption that the Government Evidence, as defined in paragraph H (4) herein, submitted by the Recorder to support a determination that the detainee is an enemy combatant, is genuine and accurate.").

[15]  *See* Enclosure 3 to Combatant Status Review Tribunal Process, at 1, C.(1) ("Upon first contact with the detainee, the Personal Representative shall explain to the detainee that no confidential relationship exists or may be formed between the detainee and Personal Representative.").  The Combatant Status Review Tribunal procedures, including all enclosures, are available at http://www.defense.gov/news/Aug2006/d20060809CSRTProcedures.pdf.

[16]  There are, of course, exceptions to the non-disclosure policy that are akin to the crime-fraud exception to the attorney-client privilege.  Thus, the personal representative needs to make disclosure necessary to prevent property damage and serious bodily harm or death.  He is also obligated to disclose detainee conduct that is fraudulent and may refuse to offer evidence that he firmly believes is false, as long as such belief is grounded in an objectively reasonable assessment of the facts.  *See* Harward Decl., Ex. C at 4-5.

detainee in reviewing the relevant unclassified information, prepare and present information, question witnesses at the CSRT proceeding, and provide comments to aid the tribunal's deliberations, *see* Enclosure (3) to CSRT Procedures July 2007 at 1-2, the DRB personal representative conducts independent investigations and calls and interviews witnesses. And, although the personal representative is part of the chain of military command, the DRB procedures specifically provide that "[t]he personal representative's good faith efforts on behalf of the detainee shall not adversely affect his or her status as a military officer (e.g., evaluation, promotion, future assignment)." Harward Decl., Ex. B at 6. Finally, all personal representatives are supervised by the Officer-in-Charge of the Detainee Assistance Center, who is a Judge Advocate, to ensure that they carry out their duty of advocating and acting in the best interests of the detainees.

Petitioner cites the article and report of a Ms. Daphne Eviatar, a staff member of Human Rights First, who stated that in the DRB proceedings she observed, the personal representatives "didn't seem to be representing much of anything." Am. Pet. ¶ 82. She also complained that non-Afghan detainees are denied access to classified information, "which often consists of nothing more than false accusations put forth by another individual bearing a grudge, or having some interest in seeing the detainee imprisoned." Am. Pet. ¶¶ 82, 85-86. While each detainee's DRB proceeding must be evaluated based on the specific facts and circumstances of the case, Ms. Eviatar's assertions are incorrect as a general matter. Indeed, according to Ms. Eviatar, much of the DRB proceedings are classified, as are the alleged false accusations upon which most of the detainees' detentions are based. But Ms. Eviatar had no access to such alleged classified information, nor was she able to observe the DRB's closed sessions. Thus, her claim

about the supposed basis of many Bagram detainees' detention is based on speculation.  The same is true with her many criticisms of the DRB process, most of which, according to her, was classified.

In any event, since the implementation of the DRB procedures, more than three hundred detainees have been released from Bagram, and hundreds more were transferred to the Afghan and other governments for prosecution or reconciliation, among other dispositions.  Harward Decl. ¶ 12.  Whatever weight the Court of Appeals had placed on the UECRB procedures then before it in *Maqaleh*, it is necessarily true that the DRB procedures can only further support the Court of Appeals' ultimate conclusion that the Suspension Clause does not apply to Bagram Airfield.

**B.**      **DoD Has Determined That Petitioner, Like Other Non-Afghan Detainees Held At Bagram, Met the Criteria for Internment.**

Finally, Petitioner alleges that "with regard to non-Afghan detainees, if they are cleared for release by the DRB, Respondents may still detain them indefinitely without justification and without evidence."  Am. Pet. ¶ 91; *see also* ¶ 109.  Petitioner alleges that he has been approved for release by the DRB, and yet still remains in U.S. custody.  *Id.* ¶ 92.

To the extent Petitioner is alleging that the jurisdiction-stripping provision of § 7(a) of the MCA of 2006, *see* 28 U.S.C. § 2241(e)(1), does not apply to him because he allegedly has been "cleared for release" by the United States, he is wrong.  Vice Admiral Harward explains that if the DRB finds that the criteria for internment for purposes of the AUMF, as informed by the laws of war, are not met, the detainee must be released as soon as practicable.  Harward Decl., ¶ 12. There is no such finding with respect to Petitioner, however.  To the contrary, in each of his DRB reviews to date, Petitioner was determined to meet the criteria for internment.  *Id.* ¶ 15.

Petitioner cites the article of Ms. Eviatar, who, upon visiting Bagram, opined that "prisoners from outside Afghanistan who are imprisoned here aren't being sent home even after they've won their case and been recommended for release." *Id.* ¶ 109 (citing Daphne Eviatar, *Justice Remains Elusive for Many at U.S. Prison in Afghanistan*, Huffington Post, Feb. 13, 2011);[17] *see also id.* ¶ 109. Ms. Eviatar's article specifically cited the example of a "Hamidullah Khan," who was allegedly "cleared for release," and yet "for some reasons, the U.S. government isn't doing it." *Id.* Ms. Eviatar, however, was confusing Bagram detainees Hamidullah and Jan Sher Khan as one person; both detainees are Pakistani citizens who have sought habeas relief in this Court. *See Hamidullah v. Bush*, 10-cv-758 (JDB); *Khan v. Bush*, 10-cv-535 (RWR). Those two detainees' situations do not indicate the existence of any U.S. policy of detaining non-Afghan detainees at Bagram indefinitely without justification.

With respect to Hamidullah*,* the United States has demonstrated through sworn declaration that he similarly has been determined to meet the criteria for internment. *See* Motion to Dismiss, *Hamidullah v. Bush*, 10-cv-758 (JDB), Dec. 17, 2010, ECF No. 11-2. With respect to Khan, one month before Ms. Eviatar's article, the United States had informed the Court that Khan did not meet the criteria for internment; that Khan's repatriation to his home country of Pakistan for release was approved by the Deputy Secretary of Defense; and that the Departments of Defense and State were undertaking steps to effect his repatriation. *See* Response to Order to Show Cause, *Khan v. Obama*, 10-CV-535 (RWR), Jan. 10, 2011, ECF No. 7. Khan has since been repatriated, and after Khan's return, the parties stipulated to dismiss Khan's habeas petition

---

[17] *Available at* http://www.huffingtonpost.com/daphne-evitar/justice-remains-elusive-f_b_822669.html.

as moot.  *See* Stipulation of Dismissal, *Khan v. Obama*, 10-CV-535 (RWR), May 12, 2011, ECF No. 11.

To be sure, when a detainee is determined to meet the criteria for internment, the DRB is required to recommend an appropriate disposition to the convening authority based on its assessment of the detainee's threat level.  For Afghan detainees, the recommendations may include continued detention, transfer to Afghan authorities for criminal prosecution or for participation in a reconciliation program, or release.  *See* Harward Decl., Ex. B at 4; Ex. C at 9.  For non-Afghan detainees, possible recommendations similarly may include transfer to a third country for criminal prosecution, participation in a reconciliation program, or release.  *Id.*  In this regard, non-Afghan detainees are treated differently from Afghan detainees only to the extent that their return to their countries of origin or their transfers to countries other than Afghanistan require approval by the Deputy Secretary of Defense or his designee.  Harward Decl., Ex. C at 11.  This is a practical necessity because appropriate diplomatic arrangements need to be made to facilitate such repatriation or transfer.  *See* Harward Decl., ¶ 13.  The repatriation of Jan Sher Khan, noted above, is such an example.

Contrary to Petitioner's suggestion, the United States has no interest in holding individuals at Bagram longer than necessary, whether or not the individual is a citizen of Afghanistan.  *See* Lietzau Decl., ¶ 9.  As Deputy Assistant Secretary of Defense for Detainee Policy explains, the policy of the United States is that if the detainee's threat may be mitigated by some lawful means other than continued detention by U.S. forces, the United States may seek to transfer the detainee to the control of other governments.  *Id.* ¶ 8.  Any such transfer would be done in accordance with U.S. policy and applicable international law after determining that the

receiving government is willing to accept responsibility for ensuring, consistent with their laws, that the detainee will not continue to pose a threat to the United States and its allies, and that such transfer would be consistent with the United States' policies relating to the humane treatment of transferees. *Id.* These considerations do not cast doubt on the integrity of the DRB process at Bagram with respect to non-Afghan detainees. In sum, whatever differential treatment non-Afghan detainees may receive in terms of transfers or repatriation, it is not a function of any attempt to deprive those detainees of the procedural safeguards of the DRB procedures. The Court of Appeals' conclusion in *Maqaleh v. Gates* that habeas does not extend to Bagram remains accurate today and is binding on this Court.

## CONCLUSION

For the foregoing reasons, this Court should dismiss the amended petition for writs of habeas corpus for lack of subject matter jurisdiction.

Dated:   June 13, 2011

Respectfully submitted,

TONY WEST
Assistant Attorney General

JOHN R. TYLER
Assistant Branch Director

    /s/    *Jean Lin*
JEAN LIN
Senior Trial Counsel
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, DC  20530
Tel:  (202) 514-3716