**EXHIBIT 2**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| AMANATULLAH, *et al.*, | ) | |
| Petitioner, | ) | |
| v. | ) | Civil Action No. 10-CV-00536 (HHK) |
| BARACK OBAMA, *et al.*, | ) | |
| Respondents. | ) | |

## DECLARATION OF ROBERT S. HARWARD

I, Vice Admiral Robert S. Harward, U.S. Navy, pursuant to 28 U.S.C. § 1746, hereby

declare as follows:

1. I currently serve as the Commander of Combined Joint Interagency Task Force-435

("CJIATF-435"). I have served as the Commander of CJIATF-435, and previously its

predecessor unit, Joint Task Force-435, since November 2009. CJIATF-435 is headquartered at

Camp Phoenix, Kabul, Afghanistan. CJIATF-435 is part of U.S. Forces-Afghanistan ("USFOR-

A") and operates as part of Operation Enduring Freedom ("OEF"). CJIATF-435 is responsible

for operating the Detention Facility in Parwan ("DFIP"), a Department of Defense ("DoD")

detention facility located adjacent to Bagram Airfield. CJIATF-435 exercises operational control

over the Task Force which is responsible for day-to-day operation of the DFIP. With policy

guidance from DoD and in cooperation with other U.S. departments and agencies, CJIATF-435's

mission is to conduct U.S. law of armed conflict detention operations under the Authorization for

Use of Military Force in support of overall U.S. and coalition operations in Afghanistan. The

statements in this declaration are based upon my personal knowledge and upon information

made available to me in the performance of my official duties.

1

### Bagram Airfield, Afghanistan

2.      Bagram Airfield is located approximately forty miles north of Kabul in the

province of Parwan, Afghanistan.  In the military campaign against al Qaeda and the Taliban

regime in Afghanistan, U.S. forces were deployed to Bagram Airfield starting in late 2001 and

early 2002, along with multinational armed forces, and had priority use of the airfield for

coalition operations.  The United States' use of Bagram Airfield was and is necessitated by its

ongoing military operations against al Qaeda and Taliban forces, and associated forces.

3.      OEF and International Security Assistance Force ("ISAF") forces conduct

military operations from Bagram Airfield.  U.S. Forces use Bagram Airfield pursuant to an

Accommodation Consignment Agreement for Lands and Facilities at Bagram Airfield between

the Government of Afghanistan and the United States of America, executed on September 28,

2006.  (A copy of this Accommodation Consignment Agreement is attached as Exhibit A.)  This

document follows similar such arrangements dating back to at least 2003.  Under this

Accommodation Consignment Agreement, which was executed "in consideration of the mutual

benefits to be derived therefrom," Afghanistan, as the "host nation," consigns all facilities and

land located at Bagram Airfield "for use by the United States and coalition forces for military

purposes."  This Accommodation Consignment Agreement provides that it continues until the

United States (or a successor) determines that the premises are no longer required for its use.

The DFIP, completed in 2009, falls under the Accommodation Consignment Agreement.  There

is continuous access between Bagram Airfield and the DFIP, serviced by two roads granting

ingress and egress.

4.      A significant multinational presence exists at Bagram Airfield as part of ISAF and

USFOR-A's missions.  ISAF operates in Afghanistan pursuant to United Nations Security

Council Resolution 1943 (2010).  ISAF's Regional Command East headquarters is located on Bagram Airfield.  The following nations have a presence at the airfield as part of ISAF:  France, the Czech Republic, Turkey, Poland, the United Kingdom, New Zealand, Jordan, U.A.E., Moldavia, Latvia, Malaysia, and Singapore.  Furthermore, the following nations have a presence at Bagram Airfield as part of Operation Enduring Freedom:  Egypt, South Korea, and Pakistan. Although U.S. forces secure Bagram Airfield, some of these nations control access to their own compounds on the Airfield.

5.      Afghan citizens enter Bagram Airfield on a daily basis.  These Afghans include local nationals performing contracted work (such as cleaning services), members of the Afghan Armed Forces, and representatives of the Afghan Government.

6.      Currently, hundreds of Afghan National Army Corrections Guards live in a Life Support Area ("LSA") adjacent to the DFIP and are partnering with U.S. forces in guard responsibilities to facilitate transition of detention operations to Afghan control.  Transition of detention operations began in January 2011, when CJIATF-435 turned over a detainee housing unit to the Afghan Ministry of Defense.

### The Detention Facility in Parwan

7.      The United States and its multinational partners are conducting an ongoing military campaign against al Qaeda and Taliban forces, and associated forces.  During the execution of this campaign, U.S. forces and coalition forces have detained thousands of individuals believed to be part of or substantially supporting Taliban or al Qaeda forces or associated forces.  Since military operations began in Afghanistan, the United States has screened and released many individuals.  A small percentage of the total number of individuals captured by the United States or transferred to U.S. control were transferred to the Bagram

3

Theater Internment Facility, a facility that is no longer in use, or are now transferred to the DFIP

for continued detention. The detention of these individuals prevents them from returning to the

battlefield and denies the enemy the fighters needed to conduct further attacks and to perpetrate

hostilities against innocent civilians, U.S. and coalition forces, and the Government of

Afghanistan. The United States also gathers important intelligence from these individuals during

their detention, which in turn enables the United States to prevent future attacks.

8.       DoD registers individuals held under its control at the DFIP with the National

Detainee Reporting Center ("NDRC") -- which accounts for persons who receive Internment

Serial Numbers issued by DoD while in DoD's custody -- and with the International Committee

of the Red Cross ("ICRC"). The ICRC has regular access to the DFIP and conducts private

interviews with detainees. Additionally, representatives of the Government of Afghanistan have

access to Afghan detainees at the DFIP.

## Detainee Review Process

9.       Detainees under DoD control at the DFIP are subject to a review process by a

Detainee Review Board ("DRB") that determines (a) whether the criteria for internment are met,

and; (b) if so, whether internment is necessary to mitigate the threat posed by the detainee, by

taking into account the detainee's potential for rehabilitation, reconciliation, and eventual

reintegration into society. This review process is in accordance to the Deputy Secretary of

Defense's policy guidance adopted on July 2, 2009 ("2 July 2009 Policy"). On July 11, 2010,

the CJIATF-435 commander adopted guidance ("CJIATF-435 guidance") implementing the 2

July 2009 Policy.  (A copy of the 2 July 2009 Policy and the CJIATF-435 guidance are attached

as Exhibits B and C.)

10.      Under the DRB procedures, the commander of the facility is required to ensure

4

that a detainee receives timely notice of the basis for his internment, including an unclassified summary of the specific facts that support the basis for such internment. The status of each detainee is reviewed no later than sixty days after the detainee is initially transferred to the DFIP, and periodically thereafter, by a board of three field-grade officers. The DRB procedures follow the 2 July 2009 Policy and the CJIATF-435 guidance and include procedures that enable the detainee to challenge his detention, including a reasonable investigation into any exculpatory information the detainee offers, notice to the detainee of the purpose of the hearing, and the opportunity to present information including reasonably available witnesses and documentary information. Additionally, every detainee is appointed a "personal representative" who is "familiar with the detainee review procedures" and has access to all reasonably available information, including classified information, relevant to the determination of whether the detainee meets the criteria for internment and whether the detainee's continued internment is necessary. The personal representative is required to "act and advocate in the best interests of the detainee" by assisting the detainee in "gathering and presenting the information reasonably available in the light most favorable to the detainee." Interpreters are provided to the detainee, if needed. Subject to certain exceptions, the unclassified session of the board proceedings is open; detainees are entitled to attend all open sessions, and are permitted to testify (but may not be compelled to do so), call witnesses, question the government's witnesses, and present documentary information. The board makes its determination using the preponderance of the evidence standard and based on the same criteria for who may be lawfully detained that the U.S. Government has applied in the context of habeas review of detentions at Guantanamo Bay. Unlike in the Combatant Status Review Tribunals previously afforded to detainees at Guantanamo Bay, the new DRB procedures do not provide a presumption of validity for the

government's evidence.

11.     The DRB process, with the procedures explained herein, was implemented in the

Fall of 2009 following a requisite period of congressional notification of the change in policy.

The DRB process provides greater procedural safeguards for each detainee than previously

existed at Bagram, including providing a personal representative to assist each detainee during

preparation for, and conduct of, the board hearing and in confronting all evidence presented at

the open session.  The personal representative is additionally bound by a non-disclosure policy

prohibiting the disclosure of information detrimental to the detainee's case that was obtained

through communications between the detainee and the personal representative, subject to certain

exceptions.  Detainees are also provided an opportunity to call reasonably available witnesses

and to present documentary evidence to an impartial board of commissioned officers.  Between

March 6, 2010 and May 6, 2011, one thousand seven hundred and ninety-two (1,792) witnesses

were called to testify in-person at DRBs, and an additional four hundred and twenty-five (425)

testified telephonically.

12.     If the board finds that the criteria for internment are not met, the detainee must be

released as soon as practicable.  Even if a detainee is determined to meet the criteria for

internment, he can be released if the board finds that internment is no longer necessary to

mitigate the threat the detainee poses.  By practical necessity, the return of non-Afghan detainees

to their countries of origin or the transfer of non-Afghan detainees to countries other than

Afghanistan requires approval by the Deputy Secretary of Defense or his designee so that

appropriate diplomatic arrangements may be made in advanced of such repatriation or transfer.

Since the implementation of the DRB procedures in 2009, more than three hundred detainees

have been released from Bagram based on a finding that the detainee did not meet the criteria for

internment, and hundreds more were transferred to the Afghan or other governments for prosecution, reconciliation or release.

### Petitioner AMANATULLAH

13.     I have reviewed the above-styled First Amended Petition for Writ of Habeas Corpus for Petitioner filed on May 16, 2011.

14.     DoD records reflect that a citizen of Pakistan whose name is the same as or reasonably similar to Petitioner's is being detained at the DFIP.

15.     Petitioner, like all other detainees who are housed in the DFIP, receives a periodic review of his detention by a Detainee Review Board.  His last DRB review occurred on December 4, 2010.  Prior to that time, Petitioner had DRB reviews on June 5, 2010 and December 2, 2009.  In each of Petitioner's DRB reviews, U.S. forces have determined that Petitioner met the criteria for internment and that he is lawfully detained pursuant to the Authorization for Use of Military Force, as informed by the law of war.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on **28** May 2011.

ROBERT S. HARWARD
Vice Admiral, U.S. Navy
Commander, Combined Joint
Interagency Task Force-435

**EXHIBIT A to Harward Declaration**

PARWAN PROVINCE                                    DACA-AED-5-06-6559
                                                   BAGRAM AIRFIELD

## ACCOMMODATION CONSIGNMENT AGREEMENT

### FOR LANDS AND FACILITIES AT

### BAGRAM AIRFIELD

### BETWEEN

### THE ISLAMIC REPUBLIC OF AFGHANISTAN

### REPRESENTED BY

### HIS EXCELLENCY GENERAL ABDUL RAHIM WARDAK
### MINISTER OF DEFENSE
### OF THE OFFICE OF THE MINISTRY OF DEFENSE

### AND

### THE UNITED STATES OF AMERICA

This **ACCOMMODATION CONSIGNMENT AGREEMENT** made and entered into this 28th day of September 2006, by and between **THE ISLAMIC REPUBLIC OF AFGHANISTAN, REPRESENTED BY HIS EXCELLENCY GENERAL ABDUL RAHIM WARDAK, MINISTER OF DEFENSE, OF THE OFFICE OF THE MINISTRY OF DEFENSE**, hereinafter referred to as the **HOST NATION**, and The **UNITED STATES OF AMERICA**, hereinafter referred to as the **LESSEE**, or the **UNITED STATES**:

**WITNESSETH THAT:**

**WHEREAS:** The **UNITED STATES** and the **HOST NATION**, hereinafter referred to jointly as the **PARTIES**, wish to enter into an Accommodation Consignment Agreement, hereinafter referred to as the Agreement, whereby the **HOST NATION** consigns all facilities and land located at **BAGRAM AIRFIELD, PARWAN** owned by the **HOST NATION**, or **PARWAN PROVINCE**, or **PRIVATE INDIVIDUALS, or OTHERS**, for use by the **UNITED STATES** and Coalition Forces for military purposes; and,

**WHEREAS:** The **MINISTER OF DEFENSE**, is the bona fide representatives of the **HOST NATION** for all Real Estate matters legal or otherwise pertaining to or occurring at **PARWAN PROVINCE;** and has authority to execute Real Estate documents on behalf of **THE ISLAMIC REPUBLIC OF AFGHANISTAN;** and

**WHEREAS:** The **PARTIES** further desire that all previous Real Estate and use agreements at **PARWAN PROVINCE**, between the **UNITED STATES** and the **HOST NATION**, or **PARWAN PROVINCE, or PRIVATE INDIVIDUALS, or OTHERS**, will be terminated upon the execution of this Agreement by both **PARTIES**.

**NOW THEREFORE**, in accordance with the desires of the **PARTIES** and in consideration of the mutual benefits to be derived therefrom, the **PARTIES** hereto mutually covenant and agree as follows:

1. The **HOST NATION** hereby consigns to the **UNITED STATES** to have and to hold for the exclusive use of the **UNITED STATES** Forces land, facilities, and appurtances currently owned by or otherwise under the control of the **HOST NATION**, or **PARWAN PROVINCE**, or **PRIVATE INDIVIDUALS, or OTHERS**, at **PARWAN PROVINCE**, hereinafter referred to as "the Premises" described as: One parcel

HN____

US____

PARWAN PROVINCE                                    DACA-AED-5-06-6559
                                                  BAGRAM AIRFIELD

of land containing approximately 8082 jeribs (approximately 16,164,248 square meters) located within
PARWAN Province, Afghanistan, and more particularly described as located within the following grid
coordinates:

42SWD2165165842
42SWD2220765799
42SWD2285465102
42SWD2297564547
42SWD2297263721
42SWD2301863125
42SWD2309363085
42SWD2371563710
42SWD2437965919
42SWD2506864666
42SWD2653864898
42SWD2787565943
42SWD2722267302
42SWD2561568407
42SWD2587668650
42SWD2575668797
42SWD2609869452
42SWD2573668823
42SWD2549369261
42SWD2482269430
42SWD2481868906
42SWD2441469060
42SWD2420468236
42SWD2356868275
42SWD2265766138
42SWD2240365893
42SWD2274064648
42SWD2371364596
42SWD2384764764
42SWD2382964921
42SWD2275065491
42SWD2257165535
42SWD2248166374
42SWD2311267244
42SWD2430968936
42SWD2669664709
42SWD2701864970
42SWD2369868338

as shown in purple in Exhibit "A", attached hereto and made a part of this agreement, to be used for
LESSEE'S purposes.

2. The **UNITED STATES** shall have the right to assign this agreement to a successor nation or
organization. This agreement in its entirety shall apply to the **UNITED STATES** and the successor nations
or organizations, hereinafter referred to as "the Successor."

3. The **UNITED STATES** shall have the right to enter into a Lease or Local Administrative Agreement
with successor nations or organizations for any and all fixtures, additions, alterations, improvements, or
structures owned by the **UNITED STATES** and located on the property which is the subject of this
agreement.

4. The term of this Agreement shall commence the earlier the date of execution by the **HOST NATION**,
or 31 days from the date of this Agreement and shall continue until the **UNITED STATES** or its
successors determine that the Premises are no longer required for its use.

HN_____

US_____

**PARWAN PROVINCE**                                    DACA-AED-5-06-6559
                                                       BAGRAM AIRFIELD

5. The **HOST NATION** makes the Premises available to the **UNITED STATES** without rental or any other consideration for use of the Premises.

6. The **UNITED STATES** shall be responsible for obtaining and making payment of all other charges for utilities and services it deems necessary to its operations, including but not limited to heat, electricity, hot water, refuse collection, annual cleaning and adjustment of heating systems. Arrangements and payments of utilities and services used shall be made by separate contract.

7. The **UNITED STATES** shall have the right, during the existence of this Agreement, to make alterations and additions, including, but not limited to grade, condition, installing drainage facilities, place gravel or hard stand, attach fixtures, erect improvements and structures or signs, and remove all obstructions which may constitute a hindrance, in or upon the Premises. Any such fixtures, additions, alterations, improvements or structures, so placed in upon or attached to the said Premises, shall remain the property of the **UNITED STATES** and, at the option of the **UNITED STATES**, may be left in place, removed or otherwise disposed of by the **UNITED STATES**, except as otherwise directed in this Agreement. If the **UNITED STATES** elects to leave in place any or all of the said additions, fixtures, structures or improvements, it shall have no further obligation with respect to restoration of any of the Premises to the previous condition. Any such fixtures, structures or improvements abandoned by the **UNITED STATES** shall become the property of the **HOST NATION**.

8. The **MINISTER OF DEFENSE** hereby warrants and guarantees that the **HOST NATION** is the sole owner of the Premises and/or has the right, without any restrictions, to grant the use of the Premises. The **HOST NATION** will hold the **UNITED STATES** harmless against any claim arising out of the **UNITED STATES'** possession of land encompassed by the Premises. Any person that brings a claim for possession of land encompassed by the Premises will be directed to the **HOST NATION** through the **MINISTRY OF DEFENSE** or its representative, who shall process the claim and make a decision to accept the claim or deny the claim, whichever the **HOST NATION** deems appropriate. In cases where the **HOST NATION** makes a decision to honor the claim, the **HOST NATION** is responsible for payment. While **HOST NATION** adjudicates any claim by any third party, **HOST NATION**, authorizes the **UNITED STATES** to continue to with operations and maintain exclusive control of the area described in this Agreement

9. The **HOST NATION** covenants and warrants that the **UNITED STATES** shall have exclusive, peaceable, undisturbed and uninterrupted possession of the Premises during the existence of this agreement. The **UNITED STATES** shall hold and enjoy the Premises during the period of this agreement without any interruption whatsoever by the **HOST NATION** or its agents.

10. Any notice under the terms of this consignment agreement, including by the **UNITED STATES** to give notice of its intent to terminate the Agreement, shall be in writing signed by a duly authorized representative of the party giving such notice, and if given by the **UNITED STATES**, or the Successor in possession, a copy shall be addressed to:

**HE GENERAL ABDUL RAHIM WARDAK**
**MINISTER OF DEFENSE**
**OF THE OFFICE OF THE MINISTRY OF DEFENSE**
**THE ISLAMIC REPUBLIC OF AFGHANISTAN**
**KABUL, AFGHANISTAN**

and if given by the **HOST NATION**, shall be addressed to:

**ATTN: CREST**                                  **U. S. ARMY CORPS OF ENGINEERS**
**CJTF76 CJ7**                                   **SAVANNAH DISTRICT**
**BAGRAM AIRFIELD, AFGHANISTAN**      or,      **ATTN: SASRE**
                                                 **100 WEST OGLETHORPE STREET**
                                                 **P.O. BOX 889**
                                                 **SAVANNAH, GEORGIA 31402-0889**

HN____

US ____

**PARWAN PROVINCE**

DACA-AED-5-06-6559
BAGRAM AIRFIELD

11. The **UNITED STATES** or the Successor in possession of the Premises shall have the right to terminate this agreement in whole or in part by providing **HOST NATION** written notice of its intent. If the Agreement is terminated in part, the terms and conditions of the Agreement remain in full force and effect for the remaining Premises.

12. If any Successor elects to terminate this Agreement, in whole or in part, during its use of the Premises, the **UNITED STATES** shall have sixty (60) days from the date the Successor surrenders the Premises to give notice of its intent to resume its use of the surrendered Premises to the **HOST NATION**. The **UNITED STATES** shall have use of the surrendered Premises on the date of its notice to the **HOST NATION**. If the **UNITED STATES** does not provide said notice, the surrendered Premises shall revert to the possession of the **HOST NATION**.

13. This Agreement supersedes all previous agreements between the **UNITED STATES** and **HOST NATION** for the use of Bagram Airfield, including, but not limited to Accommodation Consignment Agreement numbered DACA-AED-5-06-472 dated 30 AUGUST 2006.

14. This Agreement is executed in English. A courtesy translation may be furnished to the **HOST NATION**. In the event of inconsistency between any terms and conditions of this Agreement and its translation, the English language version shall have precedence and control.

IN WITNESS WHEREOF, the **PARTIES** hereto have hereunto subscribed their names.

FOR THE ISLAMIC REPUBLIC OF AFGHANISTAN:

Witness: _____

_____
HE GENERAL ABDUL RAHIM WARDAK        (DATE)
MINISTER OF DEFENSE
OF THE OFFICE OF THE MINISTRY OF DEFENSE
KABUL, AFGHANISTAN


AND


FOR THE UNITED STATES OF AMERICA:

9-26-2006

Witness: _____

CHRISTOPHER D. DIRR        (DATE)
REALTY CONTRACTING OFFICER
CONTINGENCY REAL ESTATE SUPPORT TEAM (CREST)
PURSUANT TO AUTHORITY GRANTED BY THE SECRETARY OF THE ARMY
CJTF76 CJ7
BAGRAM AIRFIELD, AFGHANISTAN
DSN: (318) 231-2925


HN____
US____

# Reference Map: Bagram



Afghanistan 1:1,000,000

Orientation Map

**Projected Coordinate System:**
WGS 1984 UTM Zone 42N
Projection: Transverse Mercator
False Easting: 500000.00000000
False Northing: 0.00000000
Central Meridian: 69.00000000
Scale Factor: 0.99960000
Latitude Of Origin: 0.00000000
Linear Unit: Meter
**Geographic Coordinate System:**
GCS WGS 1984
Datum: WGS 1984
Prime Meridian: 0
Angular Unit: Degree
Source Data: CJ7 Database

**Legend**

**Cities**
**Classification**
- National Capital
- Province Capital
- District Center
- Major City

**Road Infrastructure**
**Road Class**
- National Highway
- Primary Road
- Secondary Road
- Tertiary Road

1:1,000,000

**Reference Map**

0   12.5   25   50   75   100
Kilometers

Produced On 25SEP06

**EXHIBIT B to Harward Declaration**

~~SECRET~~

## UNCLASSIFIED WHEN SEPARATED FROM CLASSIFIED ENCLOSURE
### OFFICE OF THE UNDER SECRETARY OF DEFENSE
2000 DEFENSE PENTAGON
WASHINGTON, DC 20301-2000

JUL 14 2009

POLICY

The Honorable Carl Levin
U.S. Senate
228 Russell Senate Office Building
Washington, D.C. 20510

Dear Chairman Levin:

(U) Please find enclosed a copy of the policy guidance that the Deputy Secretary of Defense approved on July 2, 2009, modifying the procedures for reviewing the status of aliens detained by the Department of Defense at the Bagram Theater Internment Facility (BTIF) in Afghanistan, and related policy guidance regarding the criteria for assessing the threat such aliens represent, and regarding the authority to transfer and release such aliens from the BTIF. The enhanced detainee review procedures significantly improve the Department of Defense's ability to assess whether the facts support the detention of each detainee as an unprivileged enemy belligerent, the level of threat the detainee represents, and the detainee's potential for rehabilitation and reconciliation. The modified procedures also enhance the detainee's ability to challenge his or her detention.

(U) The modified procedures adopt the definitional framework of detention authority that the Administration first published in a Guantanamo habeas filing on March 13, 2009. Under this framework, the Department of Defense has the authority to detain "[p]ersons who planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, and persons who harbored those responsible for those attacks." The Department of Defense also has the authority to detain "[p]ersons who were part of, or substantially supported, Taliban or al-Qaida forces or associated forces that are engaged in hostilities against the United States or its coalition partners, including any person who has committed a belligerent act, or has directly supported hostilities, in aid of such enemy armed forces."

(U) In addition to assessing whether the facts support the detention of each detainee as an unprivileged enemy belligerent under this framework, the modified procedures require detainee review boards to consider each detainee's threat level and potential for rehabilitation and reconciliation. Moreover, these threat assessments will no longer be linked to the criteria for transferring the detainee to Guantanamo.

~~SECRET~~

## UNCLASSIFIED WHEN SEPARATED FROM CLASSIFIED ENCLOSURE
Derived from: Multiple Sources
Declassify on: June 30, 2019



SECRET
## UNCLASSIFIED WHEN SEPARATED FROM CLASSIFIED ENCLOSURE

(U) The modified procedures generally follow the procedures prescribed in Army Regulation (AR) 190-8, such as that the proceedings generally shall be open (with certain exceptions including for matters that would compromise national or operational security), including to representatives of the ICRC and possibly non-governmental organizations. Detainees will be allowed to attend all open sessions and call reasonably available witnesses.

(U) Key supplemental procedures not found in AR 190-8 that enhance the detainee's ability to challenge his or her detention include appointment of a personal representative who "shall act in the best interests of the detainee"; whose "good faith efforts on behalf of the detainee shall not adversely affect his or her status as a military officer (e.g., evaluations, promotions, future assignments)"; and who has access to all reasonably available information (including classified information) relevant to the proceedings. The end result is a process that approximates the process used to screen American citizens captured in Iraq.

(U) The Department of Defense submits this report on its modification of the procedures for reviewing the status of aliens detained by the Department of Defense at the BTIF in conformity with Section 1405(c) of the Detainee Treatment Act of 2005, Public Law Number 109-163, Title XIV. The modification will not go into effect until at least 60 days from the date of this report. In the meantime, it would be my pleasure to discuss the modified detainee review procedures with Members of the Committee or Committee Staff, at your convenience.

Sincerely,

Phillip Carter
Deputy Assistant Secretary of Defense
for Detainee Policy

Enclosures: As stated.

Cc: The Honorable John McCain

SECRET
## UNCLASSIFIED WHEN SEPARATED FROM CLASSIFIED ENCLOSURE

Addendum 000002

UNCLASSIFIED

## Detainee Review Procedures at Bagram Theater Internment Facility (BTIF), Afghanistan (U)

*Authority to Detain and Intern (U)*

(U) U.S. Forces operating under Operation Enduring Freedom (OEF) authority are authorized to detain persons temporarily, consistent with the laws and customs of war (e.g., in self-defense or for force protection). Additionally, OEF forces are authorized to detain, and to intern at the Bagram Theater Internment Facility (BTIF), persons who meet the following criteria:

- (U) Persons who planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, and persons who harbored those responsible for those attacks;

- (U) Persons who were part of, or substantially supported, Taliban or al-Qaida forces or associated forces that are engaged in hostilities against the United States or its coalition partners, including any person who has committed a belligerent act, or has directly supported hostilities, in aid of such enemy armed forces.

(U) Internment must be linked to a determination that the person detained meets the criteria detailed above and that internment is necessary to mitigate the threat the detainee poses, taking into account an assessment of the detainee's potential for rehabilitation, reconciliation, and eventual reintegration into society. If, at any point during the detainee review process, a person detained by OEF forces is determined not to meet the criteria detailed above or no longer to require internment to mitigate their threat, the person shall be released from DOD custody as soon as practicable. The fact that a detainee may have intelligence value, by itself, is not a basis for internment.

*Capturing Unit Review (U)*

(U) Commander, USCENTCOM, shall ensure that OEF detainee review procedures include a review by the capturing unit commander, with the advice of a judge advocate, to assess whether persons detained by the unit meet the criteria for detention. This review shall occur prior to requesting a detainee's transfer to the BTIF for internment, and normally within 72 hours of the detainee's capture.

*Transfer Request (U)*

(U) Commander, USCENTCOM, shall ensure that OEF detainee review procedures include a request, by the capturing unit commander, to transfer to the BTIF those detainees the capturing unit commander assesses may meet the criteria for internment. The capturing unit commander shall forward the transfer request to the BTIF commander for review.

UNCLASSIFIED

**UNCLASSIFIED**

*Review of Transfer Request (U)*

(U)  Commander, USCENTCOM, shall further ensure that OEF detainee review procedures include a review by the BTIF commander, with the advice of a judge advocate, to assess whether detainees whose transfer to the BTIF the capturing unit commander has requested meet the criteria for internment. This review shall occur prior to approving a request to transfer a detainee to the BTIF for internment, and normally within 14 days of the detainee's capture.

*Initial Detainee Notification (U)*

(U)  Commander, USCENTCOM, shall ensure that detainees receive timely notice of the basis for their internment, including an unclassified summary of the specific facts that support the basis for their internment. Commander, USCENTCOM shall further ensure that detainees also receive a timely and adequate explanation of the detainee review procedures, including, at a minimum: the fact that the detainee will have an opportunity to present information and evidence to a board of officers convened to determine whether the detainee meets the criteria for internment; the projected dates of the detainee's initial and periodic review boards; and the fact that a personal representative will be appointed to assist the detainee before the review boards. Detainees shall receive such notice and explanation, in writing and orally in a language the detainee understands, within 14 days after the detainee's transfer to the BTIF whenever feasible.

*Detainee Review Boards (U)*

(U)  Commander, USCENTCOM shall ensure that a board of officers reviews all reasonably available information to determine whether each person transferred to the BTIF meets the criteria for internment and, if so, whether the person's continued internment is necessary. These reviews shall occur within 60 days after the detainee's transfer to the BTIF and at least every six months thereafter.

(U)  Commander, USCENTCOM shall designate a flag or general officer to serve as the convening authority for review boards.

(U)  Review boards shall be composed of three field-grade officers authorized access to all reasonably available information (including classified information) relevant to the determinations of whether the detainee meets the criteria for internment and whether the detainee's continued internment is necessary. In order to ensure the neutrality of the review board, the convening authority shall ensure that none of its members was directly involved in the detainee's capture or transfer to the BTIF. The senior officer shall serve as the president of the review board. Another, non-voting officer shall serve as the recorder for the board proceedings.

**UNCLASSIFIED**

Addendum 000004

**UNCLASSIFIED**

(U) The convening authority shall ensure that a judge advocate is available to advise the review board on legal and procedural matters.

(U) Review boards shall follow the procedures prescribed by AR 190-8, paragraph 1-6.*e.*, as supplemented below:

- (U) The convening authority shall ensure that a personal representative, as described below, is appointed to assist each detainee before the review board.

- (U) Prior to each review board, appropriate U.S. military personnel shall conduct a reasonable investigation into any exculpatory information the detainee offers.

- (U) Review board proceedings shall follow a written procedural script in order to provide the detainee a meaningful opportunity to understand and participate in the proceedings (e.g., similar to the script used in Multi-National Force Review Committee proceedings in Iraq).

- (U) Members of the review board and the recorder shall be sworn. The recorder shall be sworn first by the president of the review board. The recorder will then administer the oath to all voting members of the review board, including the president.

- (U) A written record shall be made of the proceedings.

- (U) Proceedings shall be open except for deliberations and voting by the members and testimony or other matters that would compromise national or operational security if held in the open.

- (U) The detainee shall be advised of the purpose of the hearing, his or her opportunity to present information, and the consequences of the board's decision, at the beginning of the review board proceedings.

- (U) The detainee shall be allowed to attend all open sessions, subject to operational concerns, and will be provided with an interpreter if necessary.

- (U) The detainee shall be allowed to call witnesses if reasonably available and considered by the Board to have relevant testimony to offer, and to question those witnesses called by the review board, subject to any operational or national security concerns. Relevant witnesses serving with U.S. Forces shall not be considered reasonably available if, as determined by their commanders, their presence at the review board would affect combat or support operations. In these cases, written statements, preferably sworn, may be substituted and considered by the review board.

**UNCLASSIFIED**                                                                         3

**UNCLASSIFIED**

The president of the review board shall determine whether witnesses not serving with U.S. Forces are reasonably available. At the discretion of the president of the review board, such relevant witnesses may testify by means of video teleconference, teleconference, or sworn written statement, if it would not be feasible for the witness to testify in person.

- (U) The detainee shall be allowed to testify or otherwise address the review board.

- (U) The detainee may not be compelled to testify before the review board.

- (U) The detainee shall be allowed to present reasonably available documentary information relevant to the determination of whether the detainee meets the criteria for internment and/or whether the detainee's continued internment is necessary.

- (U) Following the hearing of testimony and the review of documents and other information, the review board shall determine whether the detainee meets the criteria for internment, as defined above. The review board shall make this determination in closed session by majority vote. Preponderance of the evidence shall be the standard used in reaching the determination.

- (U) If the review board determines that the detainee does not meet the criteria for internment, the detainee shall be released from DoD custody as soon as practicable. If the review board determines that the detainee does meet the criteria for internment, the review board shall recommend an appropriate disposition to the convening authority. The review board shall make this recommendation in closed session by majority vote. Possible recommendations are as follows:

  - (U) Continued internment at the BTIF. Such a recommendation must include a determination not only that the detainee meets the criteria for internment, but also that continued internment is necessary to mitigate the threat the detainee poses.

  - (U) Transfer to Afghan authorities for criminal prosecution.

  - (U) Transfer to Afghan authorities for participation in a reconciliation program.

  - (U) Release without conditions.

  - (U) In the case of a non-Afghan and non-U.S. third-country national, possible recommendations may also include transfer to a third country for criminal prosecution, participation in a reconciliation program, or release.

**UNCLASSIFIED**                                                    4

- (U) The review board's recommendations regarding disposition shall include an explanation of the board's assessment of the level of threat the detainee poses and the detainee's potential for rehabilitation, reconciliation, and eventual reintegration into society.

  - (U) In assessing threat, the review board shall further assess whether the detainee is an Enduring Security Threat, as defined in separate policy guidance regarding detainee threat assessment criteria and transfer and release authority at the BTIF. "Enduring Security Threat" is not a legal category, but rather an identification of the highest threat detainees for purposes of transfer and release determinations, as discussed below.

  - (U) In assessing potential for rehabilitation, reconciliation, and eventual reintegration into society, the review board shall consider, among other things, the detainee's behavior and participation in rehabilitation and reconciliation programs while detained by OEF forces. Information relevant to the assessment of potential for rehabilitation, reconciliation, and eventual reintegration into society may not be available for purposes of the detainee's initial review, but should be considered as it becomes available.

- (U) A written report of the review board determinations and recommendations shall be completed in each case.

  (U) The recorder shall prepare the record of the review board within seven working days of the announcement of the board's decision. The record will then be forwarded to the first Staff Judge Advocate in the BTIF's chain of command.

  (U) The record of every review board proceeding resulting in a determination that a detainee meets the criteria for internment shall be reviewed for legal sufficiency when the record is received by the office of the Staff Judge Advocate for the convening authority.

  (U) Whenever possible, detainees shall receive notice of the results of their review boards, in writing and orally in a language the detainee understands, within 7 days after completion of the legal sufficiency review.

*Personal Representative (U)*

  (U) The personal representative shall be a commissioned officer familiar with the detainee review procedures and authorized access to all reasonably available information (including classified information) relevant to the determination of whether the detainee meets the criteria for internment and whether the detainee's continued internment is necessary.

Addendum 000007

UNCLASSIFIED

(U)  The personal representative shall be appointed not later than 30 days prior to the detainee's review board.  The detainee may waive the appointment of a personal representative, unless the detainee is under 18 years of age, suffers from a known mental illness, or is determined by the convening authority to be otherwise incapable of understanding and participating meaningfully in the review process.

(U)  The personal representative shall act in the best interests of the detainee.  To that end, the personal representative shall assist the detainee in gathering and presenting the information reasonably available in the light most favorable to the detainee.  The personal representative's good faith efforts on behalf of the detainee shall not adversely affect his or her status as a military officer (e.g., evaluations, promotions, future assignments).

UNCLASSIFIED

Addendum 000008

**EXHIBIT C to Harward Declaration**



S̶E̶C̶R̶E̶T̶
# DEPARTMENT OF DEFENSE
US FORCES-AFGHANISTAN
KABUL, AFGHANISTAN
APO AE 09356

DC-DO

Change One
July 11 2010

MEMORANDUM FOR US Military Forces Conducting Detention Operations in Afghanistan

SUBJECT: Detainee Review Board Policy Memorandum

1. References.

   a. Deputy Secretary of Defense, Memorandum for Commander, USCENTCOM, et. al., subj: Policy Guidance on Review Procedures and Transfer and Release Authority at Bagram Theater Internment Facility (BTIF), Afghanistan (U) (July 2, 2009).

   b. Dept. of Army, Army Regulation 190-8—Enemy Prisoners of War, Retained Personnel, Civilian Internees and Other Detainees (1 October 1997).

2. Purpose. This memorandum establishes policies and procedures within JTF-435 for Detainee Review Boards (DRBs). This update supersedes all previous command policies and guidance pertaining to the review of individual detentions at the Detention Facility in Parwan (DFIP), which is now the U.S. Theater Internment Facility in Afghanistan, having replaced the BTIF in December 2009. Nothing in this memorandum is intended to supersede or conflict with existing U.S. law and Department of Defense (DoD) policy. If such conflict does exist, the interpretation of U.S. law or policy will prevail.

3. Applicability.

   a. This policy applies to all Operation Enduring Freedom (OEF) forces in Afghanistan who are responsible for providing support, administering, and or conducting Detainee Review Boards at the Detention Facility in Parwan (DFIP).

4. Responsibilities.

   a. Commander, JTF 435 serves in a dual capacity as the United States Forces– Afghanistan (USFOR-A) Deputy Commander for Detainee Operations (DC-DO) and has been made responsible for U.S. OEF detainee operations in Afghanistan.

   b. Commander, JTF 435 has designated Commander, Task Force Protector and successor Task Forces, as Commander of the DFIP. Commander, Task Force Protector is responsible for providing oversight of U.S. OEF theater-level detention operations and for providing the support to DRBs as specified in this memorandum.

SECRET

SUBJECT: Detainee Review Board Policy Memorandum

   c. The JTF 435 Director of Legal Operations exercises control and oversight the Recorder Cell, Detainee Assistance Center (DAC), Detainee Assessments Branch (DAB), and DRB operations. The Director of Legal Operations is responsible to the Commander JTF 435 for processes, procedures, personnel, and policy for DRB execution and related efforts.

5. **Commander's Intent.** Detention operations are tactical missions with broad-ranging strategic effects. As we separate those who use violence and terror to achieve their aims from the rest of the Afghan population, we must do so in a lawful and humane manner. We have an obligation to treat all Afghan citizens and third-country nationals (TCNs) with dignity and respect. Fulfilling this obligation strengthens our partnership with both the Government of the Islamic Republic of Afghanistan (GIRoA) and the Afghan people. Failure to fulfill this obligation jeopardizes public support for both the Coalition and the GIRoA.

6. **Authority to Detain and Intern.** U.S. Forces operating under OEF authority are authorized to detain persons temporarily, consistent with the laws and customs of war (e.g., in self-defense or for force protection). Additionally, in accordance with Reference A, OEF forces are authorized to detain, and to intern at the DFIP, persons who meet the following criteria:

   a. Persons who planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, and persons who harbored those responsible for those attacks;

   b. Persons who were part of, or substantially supported, Taliban or al-Qaida forces or associated forces that are engaged in hostilities against the United States or its coalition partners, including any person who has committed a belligerent act, or has directly supported hostilities, in aid of such enemy armed forces.

   c. Continued internment is based upon a determination that the person detained meets the criteria detailed above and that internment is necessary to mitigate the threat the detainee poses, taking into account an assessment of the detainee's potential for rehabilitation, reconciliation, and eventual reintegration into society. If, at any point during the detainee review process, a person detained by OEF forces is determined by the Commander of a Field Detention Site or the Commander or Deputy Commander of JTF 435, not to meet the criteria detailed above or to no longer to require internment to mitigate their threat, the person shall be released from DoD custody as soon as practicable. The fact that a detainee may have intelligence value, by itself, is not a basis for internment.

7. **Detainee Review Board (DRB).** A board of officers shall review all reasonably available information to determine whether each person transferred to the DFIP meets the criteria for internment and, if so, whether the person's continued internment is necessary. These reviews shall occur within 60 days after the detainee's transfer to the DFIP and at least every six months thereafter, for the duration of the individual's detention. Each DRB shall review the detainee's continued detention *de novo*. Therefore, although the information presented in previous hearings will likely remain relevant to future boards, the specific findings and recommendations of prior DRBs (or its predecessors) or other targeting decisions shall not be treated as dispositive or binding on subsequent DRBs.

SECRET

SECRET

SUBJECT: Detainee Review Board Policy Memorandum

8. **Convening Authority.** The Commander, JTF 435 has designated the Deputy Commander, JTF 435 to serve as the Convening Authority for detainee review boards.

9. **Detainee Review Board Composition.**

 a. **Board Members.** The Convening Authority, JTF 435, will convene DRBs from candidates nominated by commands subordinate to USFOR-A and ISAF. DRBs will be composed of three (3) field grade officers. U.S. field grade officers of any USFOR-A or ISAF unit may serve on the board. Due to the unpredictability of air travel in Afghanistan, these members must live on the Bagram Air Field complex (BAF) or temporarily relocate to BAF during periods of service on the board.

 (1) **Board Member Qualifications.** Detainee reviews present a challenging and strategically important mission for OEF. Board members, by age, experience, and temperament, must be able to exercise sound judgment and have a general understanding of combat operations and the current campaign plan to assess threats in theater and further the counterinsurgency mission through their participation on each board.

 (2) Board members must serve willingly in this capacity.

 (3) Board members must have at minimum a SECRET clearance, with TOP SECRET clearance preferred. Board members will have access to all reasonably available information (including classified information) relevant to the determinations of whether the detainee meets the criteria for internment and whether the detainee's continued internment is necessary.

 (4) In order to ensure the neutrality of the review board, no board members will be among those directly involved in the detainee's capture or transfer to the DFIP. Board members will familiarize themselves with the case files prior to the Board. If a member was directly involved in the detainee's capture or transfer to the DFIP, the member will excuse himself from that hearing.

 (5) **Scheduling and Substitutes.** The DRB Officer in Charge (OIC) will schedule DRB service dates for the members at least two weeks in advance, and the the board schedule will be posted by Task Force Protector or successor Task Forces. If a panel member is unavailable to serve for a certain DRB as scheduled, that member is responsible for providing a substitute from the other appointed members, and then informing the Board President and the DRB OIC of the change. If the member unable to serve cannot find a substitute, he will notify the Board President and the DRB OIC no less than 72 hours prior to the board.

 (6) A board member who will be on rest and recuperation leave (R&R), temporary duty (TDY), or other extended absence must submit dates of absences to JTF 435 Legal Operations to ensure that board schedule is not interrupted.

 b. **Board President.** The senior officer shall serve as the president of the DRB.

SECRET

SECRET

SUBJECT:  Detainee Review Board Policy Memorandum

   c.  Board Legal Advisor.  The Board Legal Advisor is a Judge Advocate assigned to the Office of the Staff Judge Advocate who will be available during the board to advise on legal and procedural matters, and who will review the findings of the board and submit a legal sufficiency review to the Convening Authority, except when a board does not find the criteria for continued detention is met, in which case the Legal Advisor shall certify that the board and its findings were reached in accordance with Reference (a). .

   d.  Recorder.  A non-voting officer, preferably an officer in the Judge Advocate General Corps, shall serve as the Recorder for DRB proceedings.  The Recorder is neutral and does not represent or advocate on behalf of either the government or the detainee.  The Recorder presents the detainee case file to assist the Board in its functions.  The Recorder is obligated to present all relevant evidence to the Board that is reasonably available, including evidence tending to show that internment criteria are or are not met, exculpatory evidence, and evidence that bears on the detainee's potential for rehabilitation or reintegration.  The Recorder is responsible for administrative preparation and support for the DRB and will perform the following duties:

      (1)  Give timely notice of the time and place of the DRB to board members, witnesses, the legal advisor, personal representative, capturing units, interpreters, and DFIP operations.

      (2)  Coordinate with the Detainee Assistance Center (DAC) to arrange for witnesses who are to testify in person or by videoteleconference (VTC) or phone call.

      (3)  Provide an unclassified and classified file to the board and personal representative containing all reasonably available documentary evidence/information relevant to the detainee's internment.

      (4)  Administer necessary oaths.

      (5)  Present unclassified and classified information.

      (6)  Provide the script for the proceedings.  The script may not be modified without the permission of JTF 435 Director, Legal Operations.  Submit suggested changes via the DRB OIC.

      (7)  Arrange for the necessary personnel (reporter and interpreter) and equipment.

      (8)  Prepare the DRB record within 7 days and forward it to Legal Advisor.

   e.  Personal Representative (PR).  The personal representative shall be a commissioned officer familiar with the detainee review procedures and authorized access to all reasonably available information (including classified information) relevant to the determination of whether the detainee meets the criteria for internment and whether the detainee's continued internment is necessary.

      (1)  The personal representative shall be appointed not later than 30 days prior to the detainee's review board and preferably soon enough to be present during the initial detainee notification of the basis for internment, which notification is required by Reference (a) within 14

SECRET

SUBJECT: Detainee Review Board Policy Memorandum

days after the detainee's transfer to the DFIP. The detainee may waive the appointment of a personal representative, unless the detainee is under 18 years of age, suffers from a known mental illness, or is determined by the Convening Authority to be otherwise incapable of understanding and participating meaningfully in the review process.

(2) The personal representative shall act and advocate in the best interests of the detainee. To that end, the personal representative shall assist the detainee in gathering and presenting information that is reasonably available in the light most favorable to the detainee. The personal representative's good faith efforts on behalf of the detainee shall not be permitted to adversely affect his or her status as a military officer (e.g. evaluations, promotions, future assignments).

(3) The personal representative will explain orally and in writing in a language the detainee understands that he is not an attorney but is bound by a non-disclosure policy not to disclose information detrimental to the detainee's case that was obtained through communications between the detainee and the personal representative (himself). The nondisclosure policy also applies to adverse information discovered by the personal representative's independent investigatory efforts. The exceptions to this nondisclosure policy are disclosures necessary to prevent property damage, serious bodily harm or death. A PR is under an obligation to disclose detainee conduct that is fraudulent, and may refuse to offer evidence that he firmly believes is false, so long as such belief is ground in an objectively reasonable assessment of the facts.

(4) The personal representative may not reveal any classified information to the detainee at any time.

(5) The personal representative is responsible for coordinating the appearance of witnesses and acquiring any reasonably available evidence requested by the detainee. Requests for support will be submitted, using the Personal Representative Request Form, at least 21 days in advance and will be published via a USFOR-A fragmentary order (FRAGO) that is prepared by Task Force Protector at least 14 days in advance of the detainee's hearing. Personal representatives may prepare and submit intelligence Requests for Information (RFIs) through the Task Force Protector S2. The personal representative shall also review the DFIP progress report reflecting detainee's participation in programs and detainee's disciplinary record. Requests for support not meeting these timelines but deemed critical to a full and fair hearing will be forwarded to the Director of Legal Operations for decision.

(6) The personal representative shall meet with the detainee at least twice prior to the day of the detainee's hearing and shall not decline any reasonable request for a meeting submitted by the detainee.

(7) In the event that the personal representative is assigned a detainee who has been previously assigned another personal representative, the new representative will contact and consult with the prior representative regarding the detainee's case, so long as the prior representative is reasonably available for such consultation. Whenever feasible the same personal representative should represent the detainee at a subsequent DRB hearing.

f. Linguists. CAT II certified linguists will be available for all detainees and used as required.

SECRET

SUBJECT: Detainee Review Board Policy Memorandum

g. Reporter. A certified court reporter will record the proceedings and make a summarized record within 7 days of the board. A copy of the record will be placed in each detainee's file.

10. Training:

a. Each Recorder and Personal Representative will complete a 35-hour Detainee Review Board Training Course prepared by and primarily taught by Professors from the US Army Judge Advocate General's Legal Center and School. Each PR and Recorder will also complete basic and refresher training on a weekly basis.

b. The JTF 435 Legal Directorate shall train Board Members on their duties and responsibilities prior to sitting as a member of the DRB. When available, Board Members can complete the 35-hour DRB course to satify the training requirements. Attendance at Counter Insurgency (COIN) Academy Training should be accommodated whenever practicable.

11. Initial Detainee Notification. Each detainee transferred to the DFIP shall receive timely notice of the basis for his internment, including an unclassified summary of the specific facts that support the basis for his internment in accordance with reference (a). Each detainee shall also receive a timely and adequate explanation of the DRB procedures, including, at a minimum: the fact that the detainee will have an opportunity to present information and evidence (including testimony by family members and other reasonably available witnesses and the means of procuring such testimony), to a board of officers convened to determine whether the detainee meets the criteria for internment; the projected dates of the detainee's initial and periodic review boards; and the fact that a personal representative will be appointed to assist the detainee before the review boards. Detainees shall receive such notice and explanation, in writing and orally in a language the detainee understands, within 14 days after the detainee's transfer to the DFIP whenever feasible.

12. Detainee Review Board Procedures. Detainee Review Boards shall follow the procedures deliniated below:

a. The Convening Authority shall appoint a Personal Representative, as described above, to assist each detainee before the review board.

b. Prior to each review board, the DAC, assisted as necessary by the DRB Recorder Cell and the operational commands, shall conduct a reasonable investigation into any exculpatory information the detainee offers.

c. The DRB shall follow a written procedural script in order to provide the detainee a meaningful opportunity to understand and participate in the proceeding. The script shall be translated in a language the detainee understands and the interpreter will use words that the detainee understands.

d. Members of the DRB and the Recorder shall be sworn. The Recorder shall be sworn first by the president of the review board. The recorder will then administer the oath to all voting members of the board, including the president.

SECRET

SECRET

SUBJECT: Detainee Review Board Policy Memorandum

e. A written record shall be made of the proceedings.

f. Proceedings shall be open except for deliberations and voting by the members and testimony or other matters that would compromise national or operational security if held in the open.

g. The detainee shall be advised of the purpose of the hearing, his or her opportunity to present information, and the consequences of the board's decision, at the beginning of the review board proceedings.

h. The detainee shall be allowed to attend all open sessions, subject to operational concerns, and will be provided with an interpreter if necessary. The detainee will not be present at the classified portions of the board, but the personal representative may be present.

i. The detainee shall be allowed to call witnesses if reasonably available and considered by the Board to have relevant, non-cumulative testimony to offer, and to question, in person or via his personal representative, those witnesses called by the review board, subject to any operational or national security concerns. The detainee shall also be allowed to present reasonably available documentary information relevant to the determination of whether the detainee meets the criteria for internment and/or whether the detainee's continued internment is necessary.

(1) Relevant witnesses serving with the U.S. Forces shall not be considered reasonably available if, as determined by their commanders, their presence at the review board would negatively affect combat or support operations. In these cases, written statements, preferably sworn, may be submitted and considered by the review board. The president of the board shall determine whether witnesses not serving with U.S. Forces are reasonably available. At the discretion of the president of the board, such relevant witnesses may testify by means of video teleconference, teleconference, or sworn written statement, if it would not be feasible for the witness to testify in person. In order to provide complete and credible information to the DRB live witnesses are preferred where possible; VTC is the next option to be considered, then telephone or video tape, sworn statements, and unsworn statements.

(2) Presentation of information. The rules of evidence for court-martial and other judicial proceedings are not applicable before the DRB.  However, reasonable restrictions concerning relevancy and competency of evidence are applicable.

(3) Relevant information. Relevant information means information having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the information.

(4) Excluded Information. No statement obtained by torture, or through cruel, inhuman, or degrading treatment will be considered by a DRB. Statements obtained through such coercive conduct will not be considered by a DRB, except against a person accused of torture as evidence that the statement was made.

SECRET

SUBJECT: Detainee Review Board Policy Memorandum

(5) Witnesses. Witnesses may testify during the board hearing if their testimony is relevant and not cumulative. Cumulative testimony is that testimony which goes to prove the same point which has been established by other information or evidence. Testimony may be live, via telephone or VTC, in writing as a sworn or unsworn statement, or by any other means deemed appropriate by the board president to assist the board make an appropriate findings and recommendations in a particular case.

(6) Hearsay. Hearsay is a statement, other than one made by the declarant while testifying at the hearing, offered to prove the truth of the matter asserted. The Detainee Review Board may properly receive and consider information identified as hearsay, including but not limited to, classified/intelligence reports, threat assessments, detainee transfer requests, targeting packages, disciplinary reports, observation reports, photographs, video and sound recordings, sworn/unsworn statements and character letters. As with any other type of evidence or information, the board should use its sound judgment to determine whether the information provided is trustworthy, and the board retains the discretion to determine the appropriate weight to be given to any information presented.

j. The detainee shall be allowed to testify or otherwise address the board.

k. The detainee may not be compelled to testify before the board.

l. Unit Input and Attendance. Capturing units, battle space owners (BSOs), and any other interested staff elements and commands may attend the DRB. Units or staff elements with substantive information about a detainee or the current battle-space conditions that may impact a Board's determination on release are encouraged to coordinate in advance with JTF 435 and the Recorder to present this information to the board, in writing, via VTC, conference call, or in person.

m. Guard Force Input. The commander of the Theater Internment Facility may provide input, written, in person, or via phone or VTC, related to the detainee's behavior in the DFIP and participation in work and education programs. The Theater Internment Facility Progress Report will be used as the written form of this information.

n. Findings and Recommendations. Following the hearing of testimony and the review of documents and other information, the DRB shall determine whether the detainee meets the criteria for internment, as defined above. The Board shall make this determination in closed session by majority vote with each member having an equal vote. The Board shall use the preponderance of the evidence standard in reaching its determination. Preponderance of the evidence means evidence that, after consideration of all evidence presented, tends to make one conclusion more credible and probable than any other conclusion. This preponderance is based upon the more convincing evidence and its probable truth or accuracy, and not on the amount of evidence. Proponderance of the evidence means for example that you are pursauded by the evidence presented at the board hearing that it is more probable than not that a detainee meets the criteria for detention. Where the evidence equally supports two or more opposing conclusions on whether the criteria for detention is met, the Board must deem that evidence insufficient and vote that the detainee does not meet internment criteria.

SECRET

SUBJECT: Detainee Review Board Policy Memorandum

(1) DRB Recommendation Memorandum. Following each DRB session, the DRB Recorder shall produce a memorandum, stating: (1) whether the Board found that the detainee meets the criteria for continued internment; and, (2) if so, whether or not continued internment is necessary to mitigate the threat posed by the detainee. If the answer to the first question is "no," the detainee will be released as soon as practicable. If the answer to the first question is "yes," and the answer to the second questions is also "yes," then the Board will recommend the detainee for continued internment. If the answer to the first question is "yes," but the answer to the second questions is "no," the Board will further recommend whether the detainee should be released, transferred to GIRoA for reintegration or prosecution, or transferred to a third country.

(2). If the review board determines that the detainee does not meet the criteria for internment, the detainee shall be released from DoD custody as soon as practicable, normally within 30 days of the board, without any further action necessary.

(3). If the review board determines that the detainee does meet the criteria for internment, the board shall recommend an appropriate disposition to the Convening Authority. The board shall make this recommendation in closed session by majority vote. If two-third of the board determines that the detainee meets the criteria for continued internment, but there is a not a majority recommendation for disposition, the board will further deliberate on the recommendation for disposition only. The initial finding of the board as to whether or not the detainee meets the criteria for continued detention shall not be re-visited as part of the further discussion on recommendation for disposition. Possible recommendations are as follows:

(a) Continued internment at the DFIP. Such recommendation must include a determination not only that the detainee meets the criteria for internment, but also that continued internment is necessary to mitigate the threat the detainee poses.

(b) Transfer to Afghan authorities for criminal prosecution.

(c) Transfer to Afghan authorities for participation in a reconciliation program.

(d) Release without conditions.

(e) In the case of a non-Afghan and non-U.S. third-country national, possible recommendations may also include transfer to a third country for criminal prosecution, participation in a reconciliation program, or release.

(4) The board's recommendations regarding disposition shall include an explanation of the board's assessment of the level of threat the detainee poses and the detainee's potential for rehabilitation, reconciliation, and eventual reintegration into society.

o. Enduring Security Threat Assessment. In assessing threat, the review board shall further assess whether the detainee is an Enduring Security Threat (EST), as defined in the Office of the Deputy Secretary of Defense Memorandum, Policy Guidance on Review Procedures and Transfer and Release Authority at Bagram Theater Internment Facility (BTIF), Afghanistan (U), dated 2 July 2009. "Enduring Security Threat" is not a legal category, but rather an identification of the highest threat detainees for purposes of transfer and release determinations. The

SECRET

SECRET

SUBJECT: Detainee Review Board Policy Memorandum

assessment that a detainee is an Enduring Security Threat raises the release authority outside of theater IAW CENTCOM policy.

(1) Board assessments of detainees as either Enduring Security Threats or not are not binding on the approval authority. Such assessments are recommendations.

(2) If a detainee was previously assessed as an EST by the Convening Authority, that determination may only be changed by the Convening Authority following a subsequent board. The Convening Authority shall notify CENTCOM of changes in status.

(3) In assessing potential for rehabilitation, reconciliation, and eventual reintegration into society, the board shall consider, among other things, the detainee's behavior and participation in the rehabilitation and reconciliation programs while detained by OEF forces, and whether the detainee's family and local community have demonstrated a commitment to the peaceful reintegration of the detainee. Information relevant to the assessment of potential for rehabilitation, reconciliation, and eventual reintegration into society may not be available for purposes of the detainee's initial review, but should be considered as it becomes available.

p. A written report of the review board determinations and recommendations shall be completed in each case. The findings and recommendations written report / worksheet may be modified by the DRB OIC as long as modifications are consistent with law and policy. The DRB OIC will notify the Director of Legal Operations and the Staff Judge Advocate prior to making any modifications to the findings and recommendations worksheet.

(1) Processing DRB Findings and Recommendations.

(a) The recorder shall prepare the record of the review board within seven working days of the announcement of the board's decision. The record will then be forwarded to the Board Legal Advisor who is assigned to the Staff Judge Advocate.

(b) If the board finds that the detainee does not meet the criteria for continued detention, the Legal Advisor shall certify to the Convening Authority that the board and its findings were reached in accordance with reference (a).

(c) The Legal Advisor shall provide a legal sufficiency review where the DRB determines the detainee should remain in detention. The findings and recommendations, as well as legal sufficiency review, shall be forwarded to the Convening Authority for final action.

(d) Final action on all DRB proceedings, including preparation of legal sufficiency review, shall occur within 14 days from the date of each board. Commander, JTF 435, or his designee, will review the DRB findings and recommendations and take appropriate action.

(2) The detainee will be notified, in writing and verbally in a language he or she clearly understands, within 14 days of the approval authority's decision concerning his status classification.

(3) Battle Space Owners. Battle Space Owners will be notified of all detainees approved

SECRET

SECRET

SUBJECT: Detainee Review Board Policy Memorandum

for release.

13. Authority to Release or Transfer.

a. The Commander JTF 435, or his designee, is the approval authority for the transfer or release of detainees in Afghanistan, including transfers of third-country nationals, under the control of OEF Forces, to Afghan authorities for criminal prosecution or any other lawful purpose.

b. Commander, USCENTCOM, or Deputy Commander, USCENTCOM is the approval authority for the transfer or release of detainees classified as Enduring Security Threats.

c. The return of Third Country Nationals (TCNs) to their countries of origin and the transfer of TCNs to countries other than Afghanistan requires approval by the Deputy Secretary of Defense or his designee.

d. Any other transfers not covered above, must be requested through CENTCOM.

14. Battle Space Owner (BSO) Support to the DRB. BSOs shall:

a. Familiarize pertinent members of their command with this memorandum, all references and enclosures, and provide training to units to comply with requirements set forth in this memorandum in order to ensure that units accurately assess threats of detainees, provide sufficient evidence for continued internment or prosecution of the irreconcilable threats, and provide for reintegration of those who are no longer a threat.

b. Include as much evidence in the Detainee Transfer Request (DTR) as possible to maximize options for prosecution or continued internment. Classify evidence at the lowest appropriate level. See para. 14-15, Base Detainee Operations Memorandum.

c. Review the published list of DRB detainees posted on the JTF 435 portal to identify detainees of interest who will be appearing before the board in order to provide relevant information or evidence to the Recorder.

d. Reply to published requests for information from personal representatives (PRs) in a timely manner in order to provide relevant information to the PR prior to each board to support detention and reintegration programs. Make witnesses available via VTC, phone call, or sworn statement.

e. Provide liaisons or unit representation at the DRB, if desired, in order to assist the board in determining whether a detainee is a continuing threat and should remain interned.

f. Request strategic releases (e.g., releases requested by the BSO to further counterinsurgency efforts in their areas of operations) from JTF 435. Strategic releases will be reviewed by the Operations Officer, Theater Intelligence Group, Legal Operations

11

SECRET

SUBJECT: Detainee Review Board Policy Memorandum

other applicable staff and directorates, JTF 435 Staff Judge Advocate, and the Deputy Commander before being reviewed by Commander JTF 435.

g. Review the published list of detainees found not to meet internment criteria at the JTF 435 web site and coordinate for timely pickup and release to adhere to DoD timelines.

h. Battle Space Owners are not responsible for transporting any witnesses who may want to appear in person before the DRB, but will make all reasonable arrangements to provide them:

(1) access to a VTC,

(2) access to a phone call,

(3) digital transmission of sworn statements or video taped statements in a timely manner.

i. The Detainee Assistance Center will provide travel directions and assist with access to post for any witnesses who wish to appear in person, in conjunction with Task Force Wolverine and its successor Base Operations units.

j. Battle Space Owner units are responsible for all logistical and transportation support in the transfer and release of detainees, in accordance with published release FRAGOs. The preference is for released detainees to be escorted and released as close as practicable to their homes. Units should be prepared for travel delays and inclement weather. In the event of a travel delay, a released detainee should be escorted as if he were an unbadged local national worker on post. He should be provided with food, water, latrine facilities, and a place to sit and sleep protected from the weather while awaiting transportation. Escorts must ensure reciprocal security for both the detainee and the US force personnel during the transition period until final release.

15. Task Force Protector and Successor Commands Support to DRB Operations. Provide direct support to the DRB, including but not limited to, de-conflicting and publishing DRB schedules; coordinating and executing the movement of detainees to facilitate the process; coordinating for BSO and LNO visits; providing DFIP input to the DRB; processing RFIs from all DRB personnel; providing access badging for members and approved visitors to the DRB; sourcing and managing linguist assets for the DRB hearing and preparation; sourcing and maintaining equipment (VTC, automation, recording equipment, computers, etc) necessary to conduct DRB hearings; providing life support, accountability, force protection, and administrative and logistical support for all attachments; and providing a company grade officer to serve as the DRB Executive Officer for administrative, logistic, and life cycle support.

16. Task Force Wolverine (Bagram Base Ops). Provide access in coordination with JTF 435 Legal Operations for Afghan witnesses who testify before the DRB in accordance with base access policies and procedures.

17. Support from the Theater Intelligence Group. J2, in conjunction with the Theater Interrogation Group (TIG)

SECRET

SECRET

SUBJECT: Detainee Review Board Policy Memorandum

    (1) Review Enduring Security Threat criteria and transfer criteria in submitted DTRs, in conjunction with TF Protector, in order to identify and assess threats.

    (2) Review DRB lists, input to the DRB packets, and files of those detainees recommended for transfer and strategic releases and make appropriate recommendations.

    (3) Review the files of those detainees recommended for transfer and strategic releases and make appropriate recommendations.

18. Support from the Staff Judge Advocate. Provide legal and procedural advice to the DRB and provide the Commander or his designee a legal opinion on the legal sufficiency of DRB proceedings, findings, and recommendations.

19. Support from the PAO. Provide all required public affairs planning, support, and guidance on detainee operations IAE published Public Affairs Guidance from OSD, CENTCOM, and USFOR-A.

20. Engagement and Outreach Cell. Provide all required public diplomacy planning, support, and guidance on released detainee reconciliation and reintegration.

21. Abuse Prevention and Reporting. TF Protector serves as the staff proponent for JTF-435 for abuse prevention and reporting. ***All detainees, regardless of capturing unit or place of detention, will be treated humanely at all times, in accordance with applicable US law and DoD regulations, policies, and directives.*** All JTF-435 personnel who witness, suspect, or become aware of any possible, suspected, or alleged act of detainee abuse, whether by US, Coalition, or ANSF personnel, shall take any and all necessary steps to immediately report the allegation through their chain of command. All allegations of detainee abuse or mistreatment will be investigated. The DRB Legal Advisor will report any allegations arising during a DRB hearing of abuse or mistreatment to the TF Protector S3 and the TF Protector CJA for processing. The TF Protector CJA will immediately report such allegations to the JTF 435 SJA. If a Personal Representative is made aware of an allegation of detainee abuse, the Personal Representative will report the allegation to the TF Protector S3 and the TF Protector CJA. TF Protector CJA will assist the TF Protector S3 in processing the inquiries, including forwarding all such allegations to the JTF 435 CHOPS and SJA for action.

SECRET

SECRET

SUBJECT: Detainee Review Board Policy Memorandum

22. The point of contact for interpretation of this memorandum as well as any situation not covered herein is the JTF 435, Legal Operations Director at DSN: 318-431-6170. The JTF 435 SJA shall be responsible for interpretation of legal sufficiency and requirements concerning DRBs.

ROBERT S. HARWARD
Vice Admiral, U.S. Navy
Deputy Commander, Detention Operations


Enclosure
Office of the Deputy Secretary of Defense
Memorandum, Policy Guidance on Review
Procedures and Transfer and Release Authority
at Bagram Theater Internment Facility
Afghanistan (U), dated 2 July 2009

CF:
Commander, USCENTCOM
Commander, USFOR-A
Commander, CJTF-82
Commander, CSTC-A
Commander, CFSOCC-A
Commander, Task Force Protector
Commander, Task Force Paladin
Commander, TF Cyclone
Commander, Combined Joint Special Operations Task Force