UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| AMANATULLAH, *et al.*, | ) ) ) | |
| Petitioners, | ) ) | |
| v. | ) ) | 10-cv-536 (RCL) |
| BARACK OBAMA, *et al.*, | ) ) ) | |
| Respondents. | ) ) ) | |

**MEMORANDUM OPINION**

**I.    INTRODUCTION**

Before the Court is the government's Motion to Dismiss Petitioner Amanatullah's First Amended Petition for Habeas Corpus for Lack of Subject Matter Jurisdiction. [ECF No. 10]. For reasons given below, the Court will GRANT the government's motion and dismiss Amanatullah's petition.

**II.   BACKGROUND**

Amanatullah, a citizen of Pakistan, has been detained by the United States at Bagram Airfield in Afghanistan ("Bagram") for several years. *See* First Am. Pet. for Writ of Habeas Corpus ("Habeas Pet.") [ECF No. 9] ¶¶ 1, 11. In 2010, Amanatullah filed a habeas petition in this Court[1] through his brother Abdul Razaq as his "Next Friend," and filed an amended petition in 2011. *See generally* Habeas Pet. Amanatullah claims that his detention violates his constitutional right to the Writ of Habeas Corpus as protected by the Suspension Clause of the

---

[1] The case was before Judge Kennedy until his retirement from the bench. [ECF No. 13].

United States Constitution. Habeas Pet. ¶¶ 121–23 (citing U.S. Const. Art. I § 9, cl. 2).[2] He seeks release from custody or, in the alternative, access to certain procedures, a cessation of all interrogation and torture and transfer to another facility, as well as other relief. *See id.* ¶¶ 38–39.

The government moved to dismiss the amended petition, relying heavily on the D.C. Circuit's opinion in *Al Maqaleh v. Gates* ("*Al Maqaleh II*"), 605 F.3d 84 (D.C. Cir. 2010), which held that the Suspension Clause did not cover non-U.S. citizen detainees held at Bagram. Resp'ts' Mot. To Dismiss ("Resp't's Br.") [ECF No. 10].

Amanatullah's opposition points to several categories of purportedly "new" evidence—*i.e.* evidence that was not part of the record on appeal in *Al Maqaleh II*—which he argues should alter the jurisdictional analysis from what the Court of Appeals concluded in *Al Maqaleh II*. Pet'rs' Opp'n at 3 [ECF No. 11]. First, he argues that the commencement of "full-blown civilian trials of Afghan detainees at Bagram" "belies any previously articulated claim that proximity to the battlefield renders Article III judicial review impracticable." Pet'rs' Opp'n at 7–8. Second, he argues that the government intends to detain him at Bagram "indefinitely." Pet'rs' Opp'n at 8–9. Third he points out that after *Al Maqaleh II*, the government replaced the Unlawful Enemy Combatant Review Board ("UECRB") procedures, which the Court of Appeals reviewed, with new Detainee Review Board ("DRB") procedures now in place and, though he apparently concedes that these "recent modifications make the DRB slightly less defective than the UECRB," he nonetheless insists that these new procedures are "fundamentally flawed" and

---

[2] Petitioner also raises a host of other legal theories. He alleges that his detention constitutes an action beyond the constitutional authority of the Executive under Article II of the Constitution, Habeas Pet. ¶¶ 124–28; a violation of Common Law and Statutory Habeas, Habeas Pet. ¶¶ 129–30 (citing 28 U.S.C. § 2241(c)(1) & (c)(3)); a violation of his Due Process rights, Habeas Pet. ¶¶ 131–34 (citing U.S. Const. amend. V); a violation of his right to counsel and access to courts, Habeas Pet. ¶¶ 135–37 (citing U.S. Const. amends. V & VI); a violation of Army Regulation 190–8 which he suggests this court is authorized to review under the Administrative Procedures Act, Habeas Pet. ¶¶ 138–41; and several violations of International Humanitarian and Human Rights Law, Habeas Pet. ¶¶ 142–47. This Court finds these theories fail and will not address them.

"woefully inadequate." Pet'rs' Opp'n at 9–10; 15–16. Fourth, he claims that that his own DRB at Bagram found him eligible for release. Pet'rs' Opp'n at 9–10.

Fifth, Amanatullah suggests that the government has purposefully used Bagram to evade judicial review—an attempted manipulation which, he argues, should influence the jurisdictional analysis. Pet'rs' Opp'n at 32–38. He cites a variety of documents in support of this assertion, and requests the opportunity to conduct jurisdictional discovery. Pet'rs' Opp'n at 34–38.

The government filed a Reply insisting that all of Amanatullah's "new evidence" either lacks any "factual basis or is otherwise irrelevant to the constitutional calculus involved in the jurisdictional question." Resp'ts' Reply at 2 [ECF No. 12].

After the briefing on the motion to dismiss was complete, both parties filed notices of supplemental authority.[3] The government filed notices regarding a Memorandum of Understanding ("MOU") entered between the United States and Afghanistan addressing the transfer of the Bagram detention center to Afghan control, *See* Resp'ts' Notice to Court Regarding the March 9, 2012 MOU [ECF No. 19], and the President's signing of an agreement with Afghanistan stating, in part, that it did not "seek permanent military facilities in Afghanistan," *See* Resp'ts' Supplemental Material [ECF No. 20], as support for its position that the United States did not intend to occupy Bagram permanently.

Amanatullah responded with a memorandum that reinterpreted these documents, insisting that they actually "confirm[ed] the United States' exclusive and continuing control over Bagram and its detainees, including Petitioner Amanatullah, and the U.S.'s intention and ability to

---

[3] Several of these are not relevant here. Amanatullah filed a notice to bring to this court's attention a British case issuing a writ of habeas corpus to another detainee at Bagram. Pet'rs' Notice of Supplemental Authority [ECF No. 14]. The government filed a notice regarding the National Defense Authorization Act for Fiscal Year 2012, Pub. L. No. 112–81, which they argued provided statutory support for Amanatullah's detention, and mandated certain new procedures that mitigated those concerns. Resp'ts' Notice to the Court Regarding a New Statute [ECF. No. 15]. Amanatullah responded, arguing that the NDAA did nothing to alter the status quo. Pet'rs' Resp. to Resp'ts' Notice [ECF No. 18]. The Court will not discuss these further, as they do not pertain to the resolution of the question at issue in this case.

exercise such control indefinitely." Pet'rs' Resp. to Resp'ts' Notice [ECF No. 21]; Errata Sheet [ECF No. 22].

Amanatullah subsequently filed an additional notice, attaching (1) a letter addressed to the *Al Maqaleh* counsel signed by the Chief of Staff to the President of Afghanistan favoring "fair judicial process" for all foreign detainees held at Bagram; (2) a declaration by a Col. Lawrence B. Wilkerson (Ret.) purporting to support Amanatullah's theory that the United States used Bagram to purposefully evade judicial review; (3) a similar declaration from Gelnn Carle, a retired high-ranking CIA officer; and (4) a declaration from petitioner's counsel, Tina Foster, detailing her attempts to meet with another detainee-client and his personal representative and her unsuccessful attempt to participate in a Detainee Review Board proceeding. Pet'rs' Notice [ECF No. 23].

The government responded, arguing that the Wilkerson and Carle declarations are merely speculative, couched in probabilistic language; that they are based on "what is widely known" about the evolution of U.S. detention policy over the last decade, including the history of litigation over the limits of the Suspension Clause, rather than any "actual knowledge from his prior government position," *See* Resp'ts' Resp. to Pet'rs' Supplemental Materials at 4–5 [ECF No. 24-1]; and that Amanatullah's jurisdictional theory lacks a limiting principle and would "permit world-wide application of the Suspension Clause." *Id.* at 7. As to the letter from the Afghan President's Chief of Staff, the government notes that this is a private letter from an official without authority to speak on behalf of the Afghan government, and that other top Afghan officials had made contradictory statements. *Id.* at 9–10. And, with respect to the Foster declaration, the government challenges the factual accuracy of the account therein, and denies that there are any "new facts" that directly bear on the pending motion. *Id.* at 12–13.

Finally, Amanatullah filed a response to the government's response, defending the relevance of the supplemental evidence they offered. Pet'rs' Resp. [ECF No. 25] With respect to the letter from the chief of staff, petitioner insists this is an official policy statement because it is on official letterhead, bears the seal of the President of the Islamic Republic of Afghanistan and conveys a "confirmation of the Afghan Government position." *Id.* at 2–4. With respect to the Foster declaration, he insists that the episode she chronicles shows that her client was "arbitrarily denied reasonably available in-person witnesses at their DRBs." *Id.* at 4–7. As to the Wilkerson and Carle declarations, Amanatullah concedes that their disclosures were limited to public information about the United States' purportedly deliberate evasion of judicial review, but argues that this is only because both are subject to binding non-disclosure obligations. *Id.* at 7.

## III.   LEGAL STANDARD

### A. Motion to Dismiss

Under Federal Rule of Civil Procedure 12(b)(1), a defendant may move to dismiss a complaint, or a claim therein, for lack of subject-matter jurisdiction. Fed. R. Civ. P. 12(b)(1). "Federal courts are courts of limited jurisdiction. They possess only that power authorized by Constitution and statute, which is not to be expanded by judicial decree. It is to be presumed that a cause lies outside this limited jurisdiction, and the burden of establishing the contrary rests upon the party asserting jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (citations omitted). A motion to dismiss for lack of subject matter jurisdiction in habeas cases, like jurisdictional motions in other civil cases, is subject to review under the standards of the Federal Rules of Civil Procedure. *See Rasul v. Bush*, 215 F. Supp. 2d 55, 61 (D.D.C. 2002), *aff'd, Al Odah v. United States,* 321 F.3d 1134 (D.C. Cir. 2003), *rev'd on other*

*grounds, Rasul v. Bush*, 542 U.S. 466 (2004) (applying Fed. R. Civ. P. 12(b)(1) to the government's motion to dismiss a pending habeas petition on jurisdictional grounds).

Pursuant Rule 12(b)(1), the petitioner bears the burden of establishing that the court has jurisdiction. *See McNutt v. Gen. Motors Acceptance Corp. of Ind.*, 298 U.S. 178, 182, (1936); *Bernard v. U.S. Dept. of Def.*, 362 F. Supp. 2d 272, 277 (D.D.C. 2005). "Because subject matter jurisdiction focuses on the Court's power to hear a claim, however, the Court must give the plaintiff's factual assertions closer scrutiny when reviewing a motion to dismiss for lack of subject matter jurisdiction than reviewing a motion to dismiss for failure to state a claim upon which relief can be granted under Rule 12(b)(6)." *Id.; see also Grand Lodge of Fraternal Order of Police v. Ashcroft,* 185 F. Supp. 2d 9, 14 (D.D.C. 2001).

**B.** *Boumediene* **Factors**

This case turns on whether the writ of habeas corpus extends to a noncitizen held by the United States beyond its sovereign territory. The evolution of the doctrine on the reach of the Suspension Clause has been reviewed extensively elsewhere and need not be repeated here. *See, e.g.*, *Wahid v. Gates,* 2012 WL 2389984 (D.D.C. June 26, 2012). The leading case is *Boumediene v. Bush*, where the Supreme Court adopted a three-factor test to determine whether an alien held abroad will have access to federal courts to file a habeas petition:

> (1) the citizenship and status of the detainee and the adequacy of the process through which that status determination was made; (2) the nature of the sites where apprehension and then detention took place; and (3) the practical obstacles inherent in resolving the prisoner's entitlement to the writ.

553 U.S. 723, 766 (2008) (holding that federal courts had jurisdiction over habeas petitions filed by noncitizen detainees held at Guantanamo Bay).

### C. Bagram Detainee Habeas Litigation

In 2010, the D.C. Circuit applied the *Boumediene* test and held that the suspension clause does not extend to alien detainees held at Bagram. *Al Maqaleh II*, 605 F.3d at 99. In three subsequent cases, two judges of this Court have rejected efforts by Bagram detainees to alter this jurisdictional analysis by introducing "new" jurisdictional evidence. *See Al Maqaleh v. Gates*, ("*Al Maqaleh III*") 2012 WL 5077483 (D.D.C. Oct. 19, 2012); *Hamidullah v. Obama*, (D.D.C. Oct. 19, 2012); *Wahid v. Gates*, 2012 WL 2389984 (D.D.C. June 26, 2012). Because these cases bear directly on the matter at hand, and because this Court finds their analyses of the issues particularly compelling, this opinion will next review those cases in some detail.

#### 1. *Al Maqaleh*

Between 2006 and 2008, four detainees held at Bagram Air Force Base in Afghanistan—Fadi Al Maqaleh, Haji Wazir, Amin Al Bakri, and Redha Al-Najar—filed habeas petitions in the United States District Court for the District of Columbia. *See Al Maqaleh v. Gates*, ("*Al Maqaleh I*") 604 F. Supp. 2d 205, 208 (D.D.C. 2009). One was an Afghan citizen and the other three were citizens of other non-U.S. countries. In 2009, Judge Bates applied the *Boumediene* factors and found that jurisdiction over the three habeas petitions filed by non-Afghan detainees was constitutionally mandated.[4] *Id.* at 214–35.

The United States appealed to the D.C. Circuit. *See Al Maqaleh II* 605 F.3d at 99. The Circuit reversed Judge Bates and held that Federal Courts lacked subject matter jurisdiction over habeas petitions filed by alien detainees held at Bagram. *Id.*[5]

---

[4] Judge Bates dismissed the fourth petition, by Afghan citizen Haji Wazir, and this petition was not part of subsequent litigation. *Al Maqaleh v. Gates* ("*Al Maqaleh I*"), 604 F. Supp. 2d 205, 209 (D.D.C. 2009).

[5] In brief, the Circuit reasoned as follows: As to the "citizenship and status" factor, the Circuit found that this favored petitioners who, like the successful detainee petitioners in *Boumediene*, were alien citizens classified as enemy aliens. *Al Maqaleh II,* 605 F.3d at 95–96. As to "adequacy of process" available to petitioners at Bagram, the Circuit found that petitioners had a stronger case than the *Boumediene* detainees because the process they were

The three remaining *Al Maqaleh* petitioners sought rehearing en banc based, in part, on additional evidence that was not in the record considered by the D.C. Circuit. The Circuit denied the petition for rehearing, but noted that the denial was without prejudice to petitioners' "ability to present this evidence to the district court in the first instance." *Al Maqaleh v. Gates*, No. 09-5265 (D.C. Cir. July 23, 2010). On remand, Judge Bates granted the petitioners' motion to amend their petitions to incorporate this "new" evidence. *Al Maqaleh v. Gates*, 2011 WL 666883 (D.D.C. Feb. 15, 2011).

After the new evidence was fully briefed, and a hearing conducted, Judge Bates granted the United States' motion to dismiss the amended petitions. *Al Maqaleh v. Gates*, ("*Al Maqaleh III*") 2012 WL 5077483 (D.D.C. Oct. 19, 2012).

In his opinion, Judge Bates considered four categories of purportedly "new evidence", and found no justification for departing from the Circuit's jurisdictional analysis in *Al Maqaleh II. Id.* Because it addresses issues that are virtually identical to those in the present matter, it is instructive to discuss Judge Bates' opinion in some detail.

First, Judge Bates considered evidence presented by the petitioners purporting to show that the United States intended to remain indefinitely at Bagram. *See Al Maqaleh III*, 2012 WL 5077483 at *5–7. His opinion summarized this evidence:

> Since late 2001 or early 2002, the United States has held both Afghan and non-Afghan detainees at Bagram. The United States has recently begun transferring custody of

---

afforded under the UECRB system was less robust than what was available to Guantanamo detainees. *Id*. at 96. As to the site of apprehension and detention, the Circuit contrasted the site of *Boumediene* petitioners' detention, Guantanamo, which was "under the complete and total control of our Government," with Bagram, where the court found "no indication of any intent to occupy the base with permanence," and concluded that this factor strongly favored the government. *Id.* at 96–97. Finally, as to "practical obstacles inherent in resolving the petitioner's entitlement to the writ," the court again distinguished Bagram, located in an "active theater of war" in Afghanistan and thus "exposed to the vagaries of war," with Guantanamo, where no such conditions existed, and concluded that this factor "weigh[ed] overwhelmingly" in favor of the government. *Id.* at 97–98. In sum, the court concluded that petitioners had a slightly stronger case than the *Boumediene* detainees with respect to the "process" factor, the same case with respect to "citizenship and status," and a much weaker case on the "nature of the site" and "practical obstacles" factors.

>Afghan detainees to the Afghan government. Although respondents aver that they intend eventually to transfer custody of non-Afghan detainees to . . . the Afghan government, the detainee's home country, or a third country, they have no specific plans in place to do so. Petitioners conclude that the lack of specific plans to transfer non-Afghan detainees shows that the United States has the same sort of permanent control over non-Afghan detainees at Bagram that it has over detainees at Guantanamo Bay.

*Id.* at *5 (citations omitted). Judge Bates concluded that this evidence did not upset the conclusion reached by the Circuit that the United States did not intend to remain in Bagram indefinitely. He noted that the Circuit's determination on this point rested on information that was "in fact, quite limited," largely comprised of "vague assertions" by the United States of their intention to leave. *Id.* at *6. Judge Bates found that petitioners' weak "new evidence" could not disrupt that conclusion. *Id.* The court also noted that the fact that the United States had begun transferring detainees to the Afghan government lent credence to the government's representations about their intention to leave Bagram. *Id.* Finally, the court found it significant that there had been no change to the terms of the lease that obligates the United States to leave Bagram "when it determines that the facility is no longer needed for military purposes." *Id.*

Second, Judge Bates considered petitioners' evidence regarding criminal trials run by the Afghan government at Bagram for Afghan detainees, and suggesting that the Afghan government desires foreign detainees to be removed and provided fair judicial process elsewhere. Petitioners argued that this evidence showed that the "practical obstacles" to conducting habeas litigation for detainees at Bagram were far less serious than the Court of Appeals had believed. *Id.* at *7–8. The opinion summarizes this evidence:

>After the D.C. Circuit's decision, the Afghan government began conducting criminal trials of detainees at Bagram. The parties dispute how involved the United States is in these trials. The United States describes them as "purely Afghan-run," but petitioners disagree. In their habeas petitions, they state that "the U.S. Military . . . allowed thirty-six full-blown trials of Afghan prisoners in its custody." Quoting a Boston Globe article, petitioners explain that courts are composed of Afghan "judges, prosecutors, and forensic experts," but that Americans "mentor[ ]" them. In their briefing, petitioners adopt the

9

> formulation that the United States "facilitat[es]" trials run by the Afghan government. Given the evidence petitioners have offered, the Court concludes that "facilitating" the trials—by allowing detainees to appear for trial and mentoring the Afghan participants—is an appropriate characterization of the United States' role.

*Id.* at * 7 (citations omitted). Judge Bates found that this evidence did not upset the Circuit's conclusion regarding the "practical obstacles" factor. The Circuit had cited concerns that "ordering military commanders to participate in habeas adjudications would 'divert . . . efforts and attention' from the battlefield to the courtroom." *Id.* (quoting *Al Maqaleh II*, 605 F.3d at 98). The petitioners' new evidence did nothing to alleviate such concerns because "[a] trial system run primarily by the Afghan government obviously requires many fewer U.S. military resources than would habeas adjudications conducted solely by the United State." *Id.* at *8. The Court of Appeals also found "difficulties" inherent in litigating in a "theater of war," *Id.* (citing *Al Maqaleh II*, 605 F.3d at 98) and Judge Bates concluded that petitioner's evidence did not signal any reduction as to this concern, finding it "quite plausible . . . that trials run by the Afghan government would produce less hostility and fewer security issues than litigation in Afghanistan orchestrated by the United States." *Id.* Finally, the Court of Appeals also rested its finding of practical obstacles on concerns about producing "a conflict between judicial and military opinion highly comforting to enemies of the United States," *Id.* (quoting *Al Maqaleh II*, 605 F.3d at 98)—a concern that Judge Bates found was "not present . . . when the Afghan government tries its own citizens with United States consent." *Id.*

Also under the "practical obstacles" factor, petitioners introduced a letter from the Chief of Staff to the President of Afghanistan[6] supporting "access to a fair judicial process" for non-Afghan detainees held at Bagram. Judge Bates held that petitioners' reliance on this letter was

---

[6] The same letter was submitted by Amanatullah here.

misplaced because it was just "a private letter to petitioners' counsel" not a statement of official Afghan policy. *Id.* at *8. Moreover, even if it were official policy, Judge Bates held that this would not "require a lesser diversion of military resources, change the fact that Afghanistan 'remains a theater of war,' or avert a potential conflict between the U.S. military and our courts." *See Al Maqaleh II*, 605 F.3d at 97–98.

Third, Judge Bates considered "newspaper articles, government memoranda, two declarations from former government officials, and other materials" [7] purporting to show that the United States had deliberately chosen the Bagram site for these detainees to avoid habeas jurisdiction. *Id.* at *9. The opinion summarizes this evidence:

> [Petitioners] explain, citing government memoranda, that Bagram was initially a "collection site" where U.S. officials decided which detainees should be sent to Guantanamo, but that the "linkage between" Bagram and Guantanamo was "severed over time." They then cite newspaper articles stating that transfers from Bagram to Guantanamo dropped sharply after the Supreme Court found in June 2004 in *Rasul v. Bush*, 542 U.S. 466 (2004), that detainees at Guantanamo could bring habeas petitions. In addition, they cite two articles stating directly that detainees were transferred to Bagram "in part" to avoid habeas jurisdiction; one quotes anonymous "military figures" and another appears simply to be drawing an inference from transfer statistics. Finally, petitioners argue that there was in fact a "reverse" flow of detainees from Guantanamo in the wake of *Rasul*. They cite a 2010 newspaper article stating that four high-value detainees were transferred away from Guantanamo (but not to Bagram) in the months before *Rasul* was issued, because U.S. officials predicted the outcome of *Rasul* and wanted to ensure that those detainees could not bring habeas petitions. They also state (in a point vigorously contested by respondents) that more than 30 detainees were transferred from Guantanamo to Bagram and other sites between 2007 and 2009. Finally, petitioners have submitted the declarations of Colonel Lawrence B. Wilkerson (Ret.), former Chief of Staff to Secretary of State Colin Powell, and Glenn Carle, a former CIA employee, stating that petitioners "likely" were transferred to and/or kept at Bagram to "evade judicial review of their detention." From this evidence, petitioners conclude that the Executive chose to house detainees at Bagram to ensure that they would not be able to file habeas petitions.

*Id.* (citations omitted).

---

[7] The same declarations were submitted by Amanatullah here.

Judge Bates concluded that this evidence did not justify a departure from the Court of Appeals' conclusion. First, he expressed doubt as to whether "purposeful evasion," even if found, would affect the jurisdictional analysis under *Boumediene*. *Id.* Second, he suggested that petitioners had likely waived this line of argument because most of their "new" evidence had been publicly available when they presented their case to the Court of Appeals, bur petitioners failed to press the issue there. *Id.* Third, he noted that the facts were "not as one-sided as petitioners represent," noting that detainees (including high-value ones) were transferred to Guantanamo after *Rasul*. *Id.* at 10. Fourth, he proposed plausible alternative logistical and political explanations for why the United States might want to house detainees in Bagram rather than Guantanamo. *Id.* Fifth, he noted that the Court of Appeals had already been familiar with the risk of executive manipulation and had before it evidence that was "really no different than" the "new" evidence when it decided *Al Maqaleh II* in favor of the government. *Id.* And finally, he found that petitioners' theory lacked a limiting principle and would "create universal habeas jurisdiction" because holding detainees in any location (other than Guantanamo) would be equally suspect. *Id.*

Judge Bates also considered and rejected petitioners' request for jurisdictional discovery to investigate the purposeful evasion theory. *Id.* at *11. He concluded that petitioners would need "essentially a smoking gun" to prevail on this theory and declined to authorize a "fishing expedition into . . . sensitive areas" that would be required to uncover such evidence. *Id.*

Fourth, and finally, Judge Bates considered petitioners' evidence regarding the revised procedures used to determine the status of detainees at Bagram. *Id*. Because the Court of Appeals in *Al Maqaleh II* had already concluded that this *Boumediene* factor weighed in favor of petitioners, and because petitioners conceded that the new procedures were "at least marginally

better" than the previous ones, Judge Bates ruled that this evidence did not alter the Court of Appeals' decision. *Id.* He also rejected petitioners' argument based on the fact that some of them had been cleared for release by these procedures, noting that the D.C. Circuit had explicitly held that "whether a detainee has been cleared for release is irrelevant to whether a petitioner may be detained lawfully." *Id.* at *12 (quoting *Almerfedi v. Obama,* 654 F .3d 1, 4 n. 3 (D.C. Cir. 2011)).

### 2. *Hamidullah v. Obama*

On the same day he decided *Al Maqaleh III*, Judge Bates also dismissed the amended petition of Hamidullah, a Pakistani citizen detained at Bagram. *See Hamidullah v. Obama*, 2012 WL 5077127 (D.D.C. Oct. 19, 2012). Hamidullah relied on the same "new evidence" as the *Al Maqaleh III* petitioners with the exception of one additional argument—that he was captured as a juvenile. *Id.* at *1, 3. In dismissing Hamidullah's petition, Judge Bates incorporated his reasoning from *Al Maqaleh III*, found that the "new" evidence did not call for a departure from the result in *Al Maqaleh II*, and resolved the outstanding "age" issue in favor of the United States. *Id.* at *3.

### 3. *Wahid v. Gates*

Finally, after the Court of Appeals had ruled on *Maqaleh II*, but before Judge Bates had decided *Al Maqaleh III*, Judge Gwin, sitting by designation, dismissed the habeas petition of Zia-ur-Rahman, an Afghan citizen held at Bagram. *Wahid v. Gates*, 2012 WL 2389984 (D.D.C. June 26, 2012). Judge Gwin applied the *Boumediene* factors, and concluded that "newly presented facts, even when taken in the light most favorable to him, are too similar to warrant a different conclusion than that of *Al Maqaleh* [*II*]." *Id.* at *3.

As to the "adequacy of process" factor, Judge Gwin embraced the logic that was subsequently adopted by Judge Bates in *Al Maqaleh III*: because the Circuit had already found

that this factor weighed in favor of the petitioner, and Zia-ur-Rahman conceded that the new DRB procedures marked a "marginal improvement" over the UECRB procedures in *Al Maqaleh II*, he found no reason to depart from the Circuit's analysis of this factor. *Id.* at *3–4.

As to the "nature of the site" factor, Zia-ur-Rahman introduced various evidence purporting to show that the United States intended to occupy Bagram indefinitely. Judge Gwin found that Zia-ur-Rahman had misconstrued this evidence, that he acknowledged the uncertainty of the future of Untied States' control over Bagram, and that the lack of a definite end date to the occupation was not sufficient grounds upon which to extend the writ of habeas corpus to detainees. *Id.* at *4. He concluded that "in the two years since the *Al Maqaleh* [*II*] holding, the relevant inquires for the 'nature of the site' prong remain nearly unchanged." *Id.* at *4–5.

As to the "practical obstacles" factor, Judge Gwin found that under the Court of Appeals' reasoning, because Zia-ur-Rahman was an Afghan citizen, this factor would be even more skewed in favor of the government than it was in *Al Maqaleh*. He also held that Bagram is still located in "a highly active war-zone," and that the initiation of Afghan criminal proceedings supports the government's position that they are trying to transfer control to Afghanistan. *Id.* at *5. Thus, there was no new evidence that mandated departing from the Court of Appeals' analysis of this factor in *Al Maqaleh II.*

Finally, Judge Gwin also rejected Zia-ur-Rahman's request for jurisdictional discovery, finding that such discovery "would not alter this Court's jurisdictional analysis." *Id.* at *6.

IV. **ANALYSIS**

The D.C. Circuit's holding in *Al Maqaleh II* is binding on this court. Petitioner may only succeed by showing new evidence, not part of the record before the Court of Appeals in that case, that would mandate a departure from the Circuit's application of the *Boumediene* factors

14

and produce a different outcome. Because he has failed to do so, this Court will dismiss the petition.

### A. Citizenship and Status

Amanatullah's sole "new" evidence under this factor is his evidence that the Detainee Review Board at Bagram found him eligible for release. Pet'rs' Opp'n at 9–10. But this is irrelevant to the *Boumediene* analysis. As Judge Bates noted, "whether a detainee has been cleared for release is irrelevant to whether a petitioner may be detained lawfully." *Al Maqaleh III*, 2012 WL 5077483 at *12 (quoting *Almerfedi v. Obama,* 654 F .3d 1, 4 n. 3 (D.C. Cir. 2011)).

### B. Adequacy of Process

Amanatullah's opposition brief suggests that the DRB procedures are "fundamentally flawed" and "woefully inadequate." Pet'rs' Opp'n at 9–10. The subsequently filed Foster Declaration purports to provide a demonstration of the arbitrariness of these procedures. *See* Pet'rs' Notice of Filing [ECF No. 23]; *see also* Pet'rs' Resp. at 4–7 [ECF No. 25].

This evidence does not affect the jurisdictional analysis, and will not lead this Court to depart from the conclusion of the Court of Appeals in *Al Maqaleh II*. As Judge Bates noted, *Al Maqaleh II* already held that this factor weighed in favor of petitioners because the procedures afforded were less robust than those available at Guantanamo. *See Al Maqaleh III*, 2012 WL 5077483 at *11. Moreover, Amanatullah concedes, as did petitioners in both *Al Maqaleh III* and *Wahid v. Gates* that the DRV procedures are "slightly less defective" than the UECRB ones they replaced. *See* Pet'rs' Opp'n at 15–16; *see also Al Maqaleh III*, 2012 WL 5077483 at *11 (noting that the petitioners conceded that the DRB procedures were "at least marginally better" than the UECRB ones); *Wahid*, 2012 WL 2389984 at *3–4 (noting that the petitioner conceded the new procedures amounted to a "marginal improvement" over those at issue in *Al Maqaleh II*). Thus,

the only change to the jurisdictional analysis produced by the evidence introduced here leads this Court to find that this factor weighs slightly *less* in favor of the petitioners than it did in *Al Maqaleh II*.

### C. Nature of the Site of Detention

Amanatullah arguest that the government intends to detain him at Bagram "indefinitely," Pet'rs' Opp'n at 8–9, and argues that the government has not shown any specific plan for withdrawal. Pet'rs' Resp. [ECF No. 21]; Errata Sheet [ECF No. 22]. Thus, he argues, Bagram should be treated the same as Guantanamo for purposes of this *Boumediene* factor.

This argument also fails. As Judge Bates noted, the D.C. Circuit had before it nothing but "vague assertions" from the government of their intent not to remain indefinitely in Afghanistan when it decided *Al Maqaleh II*. *Al Maqaleh III*, 2012 WL 5077483 at *6; *see also Wahid*, 2012 WL 2389984 at *4–5. The government repeats those assertions here, and even bolsters them with new evidence of their intent to transfer control to Afghanistan. *See* Resp'ts' Notice Regarding the March 9, 2012 MOU [ECF No. 19]; Resp'ts' Supplemental Material [ECF No. 20]. Moreover, as Judge Bates also noted, that the government has encouraged the Afghan government to take custody of Afghan detainees lends some further credence to the government's argument that it intends not to remain indefinitely. *Al Maqaleh III,* 2012 WL 5077483 at *6. Because the government's "vague assertions" were sufficient to satisfy the Circuit that Bagram was distinct from Guantanamo in this respect, because the government has bolstered these thin statements somewhat with additional evidence in this case, and because Amanatullah has not offered anything that would undermine this analysis, this Court will not depart from the Court of Appeals' analysis with respect to this factor. *Id.* at *6.

### D. Practical Obstacles

Amanatullah argues that the commencement of "full-blown civilian trials of Afghan detainees at Bagram" "belies any previously articulated claim that proximity to the battlefield renders Article III judicial review impracticable." Pet'rs' Opp'n at 7–8. He also points to a letter addressed to the *Al Maqaleh* counsel signed by the Chief of Staff to the President of Afghanistan favoring "fair judicial process" for all foreign detainees held at Bagram. Pet'rs' Notice [ECF No. 23].

This argument also fails. This Court agrees with both Judges Bates and Gwin that the commencement of civil trials does not change the fact that Afghanistan remains an active warzone. *See Wahid,* 2012 WL 2389984 at *5 (finding Bagram was situated in a "highly active warzone"); *Al Maqaleh III*, 2012 WL 5077483 at *8 ("remains a theater of war"). With respect to the letter, this Court agrees with Judge Bates that this is "a private letter to petitioners' counsel" not a statement of official Afghan policy. *Id*. Further, as Judge Bates noted, even if it were official policy, it would not "require a lesser diversion of military resources, change the fact that Afghanistan 'remains a theater of war,' or avert a potential conflict between the U.S. military and our courts." *Id.* (citations omitted). Thus, Amanatullah has not introduced any evidence that would allow this Court to depart from the Court of Appeals' evaluation of this factor.

### E. Purposeful Evasion of Judicial Review

Amanatullah also suggests that the government was employing Bagram as a detention site to deliberately evade judicial review, which, he argues, should influence the court's jurisdictional analysis. Pet'rs' Opp'n at 32–38. In support of this theory, he relies on several news articles, government documents obtained under FOIA, and several "Wikileaks documents."

Pet'rs' Opp'n at 32–34. He also points to declarations by Col. Lawrence B. Wilkerson (Ret.) and Gelnn Carle, a retired high-ranking CIA officer. Pet'rs' Notice [ECF No. 23].

This argument fails for several reasons. First, this Court agrees with Judge Bates' skepticism regarding the petitioner's assumption that the question of "purposeful evasion" is or should be part of the *Boumediene* jurisdictional analysis. Such a theory of jurisdiction seems to lack any limiting principle and would threaten to "create universal habeas jurisdiction"—something plainly at odds with the careful balancing of the *Boumediene* test. *See Al Maqaleh III*, 2012 WL 5077483 at *10. Moreover, even if "purposeful evasion" were a factor in the jurisdictional analysis, Amanatullah has not offered sufficient "new" evidence that would allow this Court to depart from the conclusion of the Court of Appeals in *Al Maqaleh II*. Most (if not all) of Amanatullah's "new" evidence purporting to support this theory had been publicly available when they presented their case to the Court of Appeals in *Al Maqaleh II* and thus may not lead this court to depart from the conclusion that court reached. Finally, this Court also notes, as did Judge Bates, that the facts are "not as one-sided as petitioners represent," since some detainees (including high-value ones) were transferred to Guantanamo after *Rasul v. Bush*, 542 U.S. 466 (2004) (the 2004 case that petitioner argues triggered the purposeful evasion). *See Al Maqaleh III*, 2012 WL 5077483 at *10. Thus, again, Amanatullah has failed to introduce evidence that would lead this Court to depart from the analysis of *Al Maqaleh II*.

 **F.  Jurisdictional Discovery**

Finally, Amanatullah requests the opportunity to conduct jurisdictional discovery to further pursue his "purposeful evasion" theory. Pet'rs' Opp'n at 34–38. However, habeas petitioners are "not entitled to jurisdictional discovery as of right." *Al Maqaleh III*, 2012 WL 5077483 at *11; *see also Harris v. Nelson*, 394 U.S. 286, 295 (1969) ("[T]he broad discovery

provisions of the Federal Rules of Civil Procedure do not apply in habeas cases.). Because the Court agrees with Judges Bates and Gwin that such discovery would not lead to any evidence that might affect the jurisdictional analysis, this Court denies petitioners' request. *See Al Maqaleh III*, 2012 WL 5077483 at *11 (rejecting petitioners' request for jurisdictional discovery as an attempt to engage in a "fishing expedition into . . . sensitive areas"); *Wahid*, 2012 WL 2389984 at *6 (rejecting petitioner's request for jurisdictional discovery, finding that such discovery "would not alter this Court's jurisdictional analysis").

## V. CONCLUSION

For the foregoing reasons, the government's motion to dismiss is GRANTED, and Amanatullah's request for jurisdictional discovery is DENIED.

A separate order consistent with this Opinion shall issue on this date.

Signed by Royce C. Lamberth, Chief Judge, on November 15, 2012.